In re Ray COOK, doing business as Cook Sheep Company, doing business as Westam, doing business as WLCO, doing business as Ranch America; and Leoma C. Cook, Debtors.

Stephen R. WINSHIP, Esq., Appellant,

v.

Ray COOK and Leoma C. Cook, Appellees.

BAP No. WY–97–065.
Bankruptcy No. 90–20215–A.

United States Bankruptcy Appellate Panel of the Tenth Circuit.

Aug. 19, 1998.

Rehearing Denied Sept. 11, 1998.

Stephen R. Winship, pro se.

P. Bryan Fishburn, Callister, Nebeker & McCullough, Salt Lake City, Utah, for Appellees.

Before PUSATERI, ROBINSON, and CORNISH, Bankruptcy Judges.

## OPINION

PUSATERI, Bankruptcy Judge.

Stephen R. Winship ("Winship") appeals from an order disqualifying him as counsel for the chapter 7 Trustee and requiring disgorgement of all fees and expenses previously paid out of the bankruptcy estate. For the reasons set forth below, we affirm.

## I. Background.

In March 1990, Ray Cook filed a petition for relief under chapter 7 of the Bankruptcy Code in the District of Wyoming. About a week later, his son, Alan Cook, and two limited partnerships in which they were involved, WLCO and Vancor, filed chapter 7

petitions. Gary Barney ("the Trustee") was appointed chapter 7 trustee for all four cases. After the first meeting of creditors, the Trustee reported that no assets were available for distribution to creditors from Ray's estate.

Prior to the bankruptcy proceedings, Joseph Darrah and John Walsh (collectively "Darrah") represented Ray and Alan Cook in a lawsuit against Zion's First National Bank of Salt Lake City, Utah, on a contingent fee basis that contemplated payment of their fee based on the percentage they succeeded in reducing the Cooks' loan obligation to the bank. The case was settled, and Darrah eventually brought suit against the Cooks to enforce the contingent fee agreement. The Cooks and the limited partnerships filed for bankruptcy shortly before the Wyoming State Bar Association's Committee on Resolution of Fee Disputes awarded Darrah fees in the amount of $776,345.15. Darrah was scheduled in all four cases as the largest unsecured creditor, with a disputed claim in the amount of $800,000.

On behalf of Darrah, Winship filed a complaint seeking denial of Ray Cook's discharge pursuant to 11 U.S.C.A. § 727, alleging the fraudulent transfer and concealment of assets as well as failure to disclose the transfers. He also filed a complaint seeking denial of Alan Cook's discharge on the same grounds. On August 7, 1991, Judge Harold L. Mai denied Ray and Alan Cook's discharges.

On May 24, 1991, the Trustee sought approval to employ Winship in the Vancor, WLCO, and Alan Cook cases—but not Ray Cook's case—for purposes of bringing a declaratory judgment action to determine the estates' interests in certain property and to represent the estates in a condemnation action. Attached to the Trustee's application in each case was Winship's affidavit disclosing "that I represent the creditors Joseph Darrah and John Walsh in their claim against the estate." Vancor, WLCO, and Alan Cook objected to Winship's employment, alleging a conflict of interest. Judge Mai found that there was no actual conflict and that the debtors did not have standing to object under § 327(c), and Winship's employment was approved.

In November 1991, Ray Cook and his wife, Leoma ("the Debtors"), filed a joint petition under chapter 11 in the District of Nevada. The chapter 11 was transferred to Wyoming and converted to chapter 7. It was ultimately consolidated in September 1992 with Ray Cook's 1990 case, apparently for procedural purposes only. Trustee Barney appears to have been appointed to be the trustee for the Debtors' converted case as he had been for the other four cases. Although the Debtors' consolidated cases were closely related to the cases involving their son, WLCO, and Vancor, no one has ever sought to have any of the cases substantively consolidated. To simplify our discussion, however, we will hereafter use "the Debtors" or "the Debtors' case" to refer both to Ray Cook's individual case and to his and Leoma Cook's joint case. In addition, from the record before us, it is not clear whether any of the parties or the bankruptcy court have made any effort to distinguish—if there are any relevant distinctions to be made—between the assets and liabilities of the Ray Cook estate and those of the Ray and Leoma Cook estate; we will use "the Debtors' estate" to refer to both collectively.

In August 1993, on the Trustee's complaint, Judge Mai denied Leoma Cook a discharge.

Seventeen months after the first four cases were filed, on October 22, 1992, the Trustee filed an application to employ Winship in the Debtors' bankruptcy case "to proceed against preferential transfers and other matters to be recovered for the estate." Winship's affidavit stated that he did not hold or represent an interest adverse to the Trustee or estate, "except that I also represent creditors Joseph E. Darrah and John Walsh." No objections were filed and an order approving employment was entered November 4, 1992.

Judge Mai retired in December 1993, and there being no other bankruptcy judge in Wyoming at the time, Charles E. Matheson, Chief Bankruptcy Judge for the District of Colorado, took over all pending matters, except one adversary proceeding. One of the first matters Judge Matheson heard in the

Debtors' proceeding was a motion by two creditors to disqualify and remove the Trustee and Winship as counsel for the Trustee. Judge Matheson denied the motion, holding that the objection was not timely and did not raise new information. The court also criticized the creditors for "judge shopping," apparently meaning they seemed to be seeking a new answer to a previously-resolved question simply because a new judge had taken over the case, and stated that if the Trustee was not meeting their timetable for objecting to claims, the creditors had authority to file such objections.

On May 17, 1994, Winship filed his first interim fee application in the amount of $49,611. The application was filed in the Debtors' case; Winship has filed no fee applications in the Alan Cook, WLCO, or Vancor cases. Winship's request for fees included time for services performed during the seventeen months after he was hired in those three cases but before the Trustee hired him in the Debtors' case. The application stated that the Debtors', Alan Cook's, WLCO's, and Vancor's cases were "so interrelated as to make it a meaningless exercise to try to distinguish what assets belong to a particular estate" and that, as a matter of "administrative convenience," the fee application was being made in the Debtors' case only. Remarkably, there were no objections to this application or later to his second application, and orders were entered approving both. The bankruptcy court denied Winship's third application, however, on the ground that some of the fees appeared to be based on time spent for the benefit of the related estates. Significantly, the court pointed out that the orders authorizing Winship's employment were not coextensive and that while the Trustee had hired him under a general retainer in the Debtors' case, there were restrictions on his employment in the other cases. The court went on to state that if the estates were as intertwined as Winship represented, questions then arose concerning the propriety of having a single trustee for all of the estates, as well as the propriety of having a single attorney represent the Trustee in all of the cases, citing two published court decisions for Winship's review. Winship filed an amended application that was approved by the court. In total, the Debtors' estate paid Winship $60,853.65 in fees and $7,292.98 in expenses.

During the next couple of years, two events took place that had a significant impact on the decision that has been appealed. The first event involved the Trustee's attempt to sell approximately 248 acres of land in Wyoming (the "Yellowcreek Property"). In October 1994, the Trustee, with Winship acting as his attorney, entered into a contract with an entity called Blue Blood, Inc., for the sale of the property from the Debtors' estate. An amended order authorizing that sale was entered in April 1995. Still acting for the Trustee, Winship thereafter requested a parallel order in the Vancor estate. The bankruptcy court ultimately entered four orders denying Winship and the Trustee's efforts to consummate the sale in the Vancor estate, setting forth various deficiencies in the procedures and processes used in attempting to sell the property. In the fourth order, the court denied the Trustee's request to vacate the order previously entered in the Debtors' case and to authorize the sale of property from the Vancor estate. The court criticized the Trustee for seeking to sell property out of the Vancor estate that it did not own, stating:

"The court is appalled that Mr. Winship, counsel for the Trustee, will so casually move a significant asset that belongs to one of these estates to another estate and casually administer the same in whatever estate seems to be convenient in order to cover his procedural deficiencies in obtaining approval for the sale."

The court further ordered Winship to show cause why sanctions should not be imposed against him for repeatedly filing motions that violated Rule 9011.

On January 2, 1996, the bankruptcy court entered an order for sanctions against Winship in the amount of $500. The court stated that Winship's response to the order to show cause represented, for the first time, that the problem in the sale process was that title to the Yellowcreek Property actually rested in the Vancor estate and not in the Debtors'. This revelation was apparently made evident

by a title commitment issued by a title company that had requested an order authorizing the sale in the Vancor case, and the court inferred that Winship and counsel for the purchaser had been aware of that fact for many months. The court noted that in his motion for approval of the sale in the Vancor case, Winship referred to the underwriter for the title company requesting an order in the Vancor case approving the sale, but did not represent that the title company had determined that title rested in Vancor alone, the inference being that the title company was requesting the entry of an order in all of the estates. The court stated that neither the creditors of the various estates nor the court were properly or fairly advised concerning the status of the title to the property and the appropriate disposition of the proceeds from the sale, and that the Trustee indicated a "seeming indifference" to where the money was administered, even though the estates had not been consolidated and the parties in interest were not identical. The court again referred to a possible conflict of interest among the estates, saying: "[w]hile it is not the issue before the Court today, the Court must nonetheless wonder whether it is appropriate that Mr. Barney and Mr. Winship serve all of these estates." The court went on to state that "[c]ounsel still seems to be unable to come to grips with the fact that he is acting to represent a fiduciary who has separate interests in separate estates that must be separately served."

On February 20, 1996, Winship wrote to the Trustee and Darrah advising them of the bankruptcy court's suggestion that he had developed a conflict of interest, and asking them to waive any conflict arising from his representation of the Trustee and Darrah. Each signed the letter, and Winship attached it to a motion for clarification filed in the Debtors' case requesting reconsideration of the conflict issue or clarification of the extent and parameters of his representation of Darrah and the Trustee. The bankruptcy court denied Winship's motion, stating that the record and the court's remarks were clear.

The second event that significantly affected the bankruptcy court's ruling was a settlement agreement between the Debtors and Darrah. On August 25, 1995, the Trustee, represented for this purpose not by Winship but by an attorney named Russ Blood, filed a pleading called "objections to and allowance of claims," asking the court, among other things, to allow Darrah's amended claim of $874,314.77. The Debtors then filed an objection to the claim. On behalf of Darrah, Winship began negotiating with the Debtors and on March 26, 1996, a settlement agreement was reached. This provided that the Debtors and Darrah would split evenly whatever remained in the Debtors' estate after payment of administrative claims and expenses, and claims of other creditors. The agreement specifically stated that it did not bind or affect the claims filed by Darrah in the Allan Cook, WLCO, and Vancor cases. The bankruptcy court approved the agreement in May, and in December 1996, the Trustee disbursed from the Debtors' estate $233,000 each to Darrah and to the Debtors.

Early in 1997, the Trustee, again represented by Blood, filed notices of the proposed sales of the Yellowcreek Property by the Vancor estate and of the "Blakehollow Property" by the Alan Cook estate. These sales were to generate $133,000 and $67,500 for the respective estates. The Debtors moved to have the proceeds administered in their estate. Based on a revised title commitment, the Trustee, through Blood, asked the bankruptcy court to grant the Debtors' motion with respect to the Yellowcreek Property, but asked the court to determine which estate was entitled to the proceeds of the Blakehollow Property because he did not wish "to advocate the interests of one estate over the interests of another." Darrah, represented by Winship, took the position that the Yellowcreek Property belonged to the Vancor estate and the Blakehollow Property to the Alan Cook estate.

The bankruptcy court denied the parties' request for a definitive ruling concerning the proper estate in which to administer the Yellowcreek Property, stating it was left with the conclusion that it was without credible evidence to establish who owned the property. The court chastised the Trustee, stating it was the Trustee's responsibility to determine what assets were owned by which es-

tates and that he could not abdicate that responsibility to the court. The court found that the Blakehollow Property belonged to the WLCO estate.

The Debtors subsequently moved for disqualification of Winship as counsel for the Trustee and disgorgement of attorney fees, alleging an actual conflict of interest that prompted Winship to advocate actions antithetical to the Debtors' estate. Both the Trustee (through Blood) and Winship objected. At the evidentiary hearing, it was revealed that Winship had represented Darrah on a contingent fee basis, a fact Winship had not previously disclosed.

At the conclusion of the hearing, the bankruptcy court disqualified Winship as counsel for the Trustee and ordered disgorgement of all fees and expenses paid to him by the Debtors' estate. The court indicated it was greatly bothered by the contingent fee agreement because Winship would get paid by Darrah as he was paid on his claim and was also getting paid by the Debtors' estate. In ordering disqualification, the court focused on the fact that it could and would benefit Darrah to have assets administered in one estate as opposed to another. The court stated that the settlement agreement heightened Darrah's interest in administering assets in certain estates and that it was impossible to tell whose interest Winship was serving by his conduct, noting that until the settlement was reached, Winship had said he could not tell which estate owned which assets. Pursuant to § 328(c), the court then ordered Winship to disgorge the fees and expenses he had received from the Debtors' estate on two grounds: 1) that Winship had not disclosed his contingent fee arrangement with Darrah, and 2) that, given the way the Debtors' and the related cases had proceeded, the court could not discern which activities had been tainted or colored by Winship's interest in promoting the best position for his real client, Darrah.

## II. Jurisdiction and Standard of Review.

A Bankruptcy Appellate Panel, with the consent of the parties, has jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy judges in this circuit. 28 U.S.C.A. § 158(a), (b)(1), (c)(1). As neither party has opted to have this appeal heard by the District Court for the District of Wyoming, they are deemed to have consented to jurisdiction. 10th Cir. BAP L.R. 8001–1(d).

In reviewing an order of the bankruptcy court, an appellate court "reviews the factual determinations of the bankruptcy court under the clearly erroneous standard, and reviews the bankruptcy court's construction of [a statute] de novo." *Taylor v. I.R.S.,* 69 F.3d 411, 415 (10th Cir.1995) (citations omitted).

A finding of fact is clearly erroneous only if the court has "the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). "It is the responsibility of an appellate court to accept the ultimate factual determination of the fact-finder unless that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data." *Krasnov v. Dinan,* 465 F.2d 1298, 1302 (3d Cir.1972).

*Gillman v. Scientific Research Prods. Inc. (In re Mama D'Angelo, Inc.),* 55 F.3d 552, 555 (10th Cir.1995).

Denial of an application for professional employment is reviewed under an abuse of discretion standard. *Interwest Bus. Equip., Inc. v. United States Trustee (In re Interwest Bus. Equip., Inc.),* 23 F.3d 311, 315 (10th Cir.1994); *In re BH & P Inc.,* 949 F.2d 1300, 1312–13 (3d Cir.1991) (decision to disqualify a professional and determine "potential" or "actual" conflict is within the discretion of the bankruptcy court). Denial of attorney fees and disgorgement of fees previously paid is also reviewed under an abuse of discretion standard. *Jensen v. United States Trustee (In re Smitty's Truck Stop, Inc.),* 210 B.R. 844 (10th Cir. BAP 1997). "Under the abuse of discretion standard: 'a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of

permissible choice in the circumstances.' " *Moothart v. Bell,* 21 F.3d 1499, 1504 (10th Cir.1994) (quoting *McEwen v. City of Norman,* 926 F.2d 1539, 1553–54 (10th Cir.1991)). An abuse of discretion may occur if a court bases its ruling on a view of the law that is erroneous. *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).

## III. Discussion.

### A. Disqualification.

■ The qualifications prerequisite to employment of professionals are set forth in 11 U.S.C.A. § 327. Section 327(a) provides:

> Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, ... or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

This section creates a two-part requirement for retention of counsel: counsel must "not hold or represent an interest adverse to the estate" and must be a "disinterested person." Although the phrase "hold or represent an interest adverse to the estate" is not defined in the Bankruptcy Code, numerous courts have adopted the definition offered in *In re Roberts,* 46 B.R. 815 (Bankr.D.Utah 1985), *aff'd in part and rev'd in part on other grounds,* 75 B.R. 402 (D.Utah 1987) (en banc):

> (1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under the circumstances that render such a bias against the estate.

*Id.* at 827. The term "disinterested" is defined by the Code in § 101(14), which provides in relevant part that a "disinterested person" means a person that:

> (A) is not a creditor, an equity security holder, or an insider; ...; and

> (E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor ... or for any other reason....

Subsection (E), commonly referred to as the "catch-all clause," is broad enough to exclude an attorney with some interest or relationship that " 'would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules.' " *BH & P Inc.,* 949 F.2d at 1309 (quoting *Roberts,* 46 B.R. at 828 n. 26).

■ The Bankruptcy Code also provides that a professional is not necessarily disqualified from employment based upon his representation of both the trustee and a creditor. Section 327(c) provides that:

> a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest.

This provision states that disqualification from representing the estate may not result *solely* from the professional's representation of or employment by a creditor. If a professional person is considered for employment, it remains important to determine whether the person is disqualified on any other ground; for example, an interest adverse to the estate. While representation of a creditor is not a *per se* bar to employment by the trustee under § 327(c), an actual conflict of interest or the appearance of impropriety remain as independent grounds for disqualification. *See 1 Collier on Bankruptcy* ¶ 327.04[7][b] (Lawrence P. King ed., 15th ed. rev.1998).

■ The phrase "actual conflict of interest" is not defined in the Code and has been given meaning largely through a case-by-case evaluation. Courts have been accorded considerable latitude in using their judgment and discretion in determining whether an actual conflict exists. *BH & P Inc.,* 949 F.2d at 1315.

■ Section 327's conflict of interest provisions are supplemented by Federal Rule of Bankruptcy Procedure 2014, which creates a disclosure requirement to enforce the disinterestedness standard. The rule provides, in relevant part:

(a) Application for an Order of Employment. An order approving the employment of attorneys . . . or other professionals pursuant to § 327 . . . of the Code shall be made only on application of the trustee or committee. . . . The application shall state the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, [or] any other party in interest. . . . The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, [or] any other party in interest. . . .

These disclosure requirements are not discretionary. *In re EWC, Inc.,* 138 B.R. 276, 280 (Bankr.W.D.Okla.1992).

■ Winship contends the bankruptcy court erred by finding a disqualifying conflict arising solely from his joint representation of the Trustee and Darrah, a situation he argues is expressly permitted under § 327(c) because there was no actual conflict of interest. We believe Winship reads § 327(c) too broadly. As the bankruptcy court stated, the issue in this case is the interrelationship between § 327(a) and (c). The requirements of subsection (a) are threshold requirements to be met even if subsection (c) is implicated. Subsection (c) addresses the situation where dual representation of the trustee and a creditor is the sole reason advanced for disqualification and the professional is otherwise qualified; it does not end all inquiry simply because Winship represented both the Trustee and Darrah. In this case, the bankruptcy court was also concerned about the simultaneous representation of the Trustee in all four related cases, the terms of the settlement agreement, and the contingent fee

arrangement between Winship and Darrah, the latter having been revealed for the first time at the September 1997 hearing. Since subsection (c) does not preempt the more basic requirements of subsection (a), the bankruptcy court properly focused on its responsibility to approve the Trustee's choice of professional only when that professional's judgment and advocacy will not be clouded by divided loyalty. *Interwest,* 23 F.3d at 316.

The bankruptcy court was justified in its concerns about Winship's failure to disclose the contingent fee agreement with Darrah and about the effect of the terms of the settlement agreement. Given the facts that Darrah was the largest unsecured creditor in all four of the estates and that he agreed to split with the Debtors any funds left in their estate, it was beneficial to Darrah to see that assets were administered in one estate as opposed to another. The court noted Winship's change in position with regard to the allocation of assets after the settlement agreement had been reached. Before that, Winship had asserted that the estates were so intertwined as to make it impossible to determine which assets belonged where; after the settlement agreement, he routinely argued that assets belonged in estates other than the Debtors'.

By asserting there was no actual conflict, Winship shows an incomplete appreciation of the fiduciary duty of the trustee of a bankruptcy estate and the professional's obligation to independently serve the trustee. *See Interwest,* 23 F.3d at 317–318 (noting many trustee's duties and need for professional to disclose facts required to determine whether representation of trustee and another would conflict with those duties). The application for employment and accompanying affidavits do not disclose Winship's contingent fee arrangement with Darrah. Rather than merely representing a creditor with an interest potentially adverse to the Debtors' estate, Winship had a compensation agreement that gave him a direct personal pecuniary interest in his creditor-client's recovery from all four bankruptcy estates. Compared to an hourly fee agreement, the arrangement posed a greater risk that Win-

ship would align himself so thoroughly with Darrah's interests as to lose any objectivity he might otherwise have had. Furthermore, since all four estates began with no assets and gained assets largely, if not completely, through his efforts, Winship's arrangement with Darrah meant that while Winship could be paid only to the extent he recovered assets for the estates, if he recovered enough assets, he could effectively be paid twice for the same work: once by the estate for which he recovered assets, and again from Darrah's share of the distribution of the proceeds of the assets from the estate. Some work, such as obtaining court approval of sales of assets recovered for one of the estates, and defending Darrah's claim against objections, would have been done only for one client or the other, but Winship's work in recovering assets would have effectively been done for both. An attorney is not entitled to be paid twice for the same services even if they benefitted more than one client. Finally, by seeking all his fees as the Trustee's attorney from the Debtors' estate, Winship improperly collected fees that should have been paid by one of the other estates from money that, under the settlement agreement, would have been split between the Debtors and Darrah.

■ Darrah's claim against the Debtors' estate was listed in their schedules as disputed, as were all claims listed, so Darrah's position was at least somewhat adverse to the estate from the beginning. This conflict would not have been significant while the Debtors' estate had no assets, but would have become an actual conflict as soon as any asset was recovered. The contingent fee agreement heightened the conflict by adding Winship's personal pecuniary interest to the situation. Furthermore, because Winship also represented the three other estates with interrelated interests, his decisions about which estate an asset belonged in could have been colored by a desire to maximize not only Darrah's recovery, but also his own, by shifting assets to the estate that would pay Darrah the largest share. Of course, the interests of the creditors of any one of the estates, and so, of a trustee independently representing that estate, should have been to maximize the assets available in that estate alone. Later, the settlement agreement be-

tween the Debtors and Darrah sharpened that conflict, because it became even more beneficial to Darrah and Winship for proceeds to be administered in estates other than the Debtors'. As counsel for the Trustee, Winship had the power to move assets around, as evidenced by his various attempts to get the court's approval of the sale of the Yellowcreek Property. The Tenth Circuit recognizes that bankruptcy courts have broad discretion and power to ensure that professionals are disinterested and do not represent interests adverse to the estate, and recognizes that potential conflicts are a sufficient basis for disqualifying them. *Interwest*, 23 F.3d at 316–18. We find that the bankruptcy court exercised sound discretion in its characterization of the conflict presented here.

We also reject Winship's assertion that Blood's representation of the Trustee for some matters served to "buffer" any actual conflict. The hiring of additional counsel might have been a solution if the parties had been dealing with a single case and the dual representation of the Trustee and a creditor with an undisputed claim. However, this case involved Winship's simultaneous representation of the Trustee for multiple estates with conflicting claims to assets, and of the largest creditor of each of those estates, whose claim was listed as disputed from the very beginning. Winship's conflict existed from the beginning of his representation of the Trustee and permeated the entire proceedings. Blood was hired much later and on a limited basis to review and object to claims. After consulting with Winship, Blood decided not to object to Darrah's claim, but the Debtors did and were able to obtain a settlement agreement that significantly reduced the priority of his claim. After Darrah's claim against the Debtors' estate was settled, Blood took an equivocal position concerning which estate owned assets that had been recovered and sold, while Winship abandoned his earlier position that it was a "meaningless exercise" to try to determine the true ownership and tried to have them administered in estates other than the Debtors'. The bankruptcy court properly refused to allow Winship to hide behind Blood, whose

representation of the Trustee was too limited and too late in the proceedings for us to be convinced that he served as an effective shield against Winship's conflict.

 Winship further argues that the doctrines of law of the case, collateral estoppel, and *res judicata* apply, and that the bankruptcy court was bound by the previous orders allowing employment and fees and denying disqualification. We must reject this contention for a number of reasons. Except for an interlocutory order that has previously been appealed, none of these doctrines applies to interlocutory orders, but only to final, appealable ones. *Unioil v. Elledge (In re Unioil, Inc.)*, 962 F.2d 988, 993 (10th Cir.1992) (law of the case); *Frandsen v. Westinghouse Corp.*, 46 F.3d 975, 978 (10th Cir.1995) (collateral estoppel); *Hoxworth v. Blinder*, 74 F.3d 205, 208 (10th Cir.) (*res judicata*), *cert. denied*, —— U.S. ——, 117 S.Ct. 66, 136 L.Ed.2d 27 (1996); *Woods v. Kenan (In re Woods)*, 215 B.R. 623, 625 (10th Cir. BAP 1998) (district court order on prior, interlocutory appeal applied as law of the case). An order approving employment, allowing interim fees, or denying disqualification of a professional is not a final, appealable order. *Spears v. United States Trustee*, 26 F.3d 1023, 1024 (10th Cir.1994). In addition, § 328(c) states that a professional's compensation may be denied "if, at any time during such professional person's employment under section 327," the professional was not disinterested, or represented or held an interest adverse to the estate with respect to the subject matter of his employment. This provision alone prevented the earlier orders in the case from binding the bankruptcy court and requiring it to allow Winship to remain the Trustee's attorney. Finally, neither Judge Mai nor Judge Matheson had previously been informed of some of the circumstances that led to Winship's disqualification. The first motion to disqualify cited by Winship was not even made in the Debtors' bankruptcy case, but rather in the three related proceedings; Winship was not approved as counsel for the Trustee in the Debtors' case until some months later. The second motion to disqualify Winship was brought before Judge Matheson [1] by two creditors and was based on their dissatisfaction with the speed at which the Trustee was proceeding with objections to claims. The third motion to disqualify is the subject of this appeal, and was based for the first time on Winship's previously undisclosed contingent fee agreement with Darrah and the recent settlement agreement. Because these circumstances had not been involved in the earlier motions, the bankruptcy court could not have been prohibited from revisiting Winship's possible disqualification for a third time.

 Winship next contends that the Debtors had no standing to object to his representation of the Trustee under § 327(c). This argument ignores the unique responsibilities the Bankruptcy Code imposes on bankruptcy judges in connection with professionals employed by the estate. A bankruptcy court has the authority and the responsibility to approve the employment only of professionals who meet the minimum requirements set forth in § 327(a), independent of objections. *In re Granite Sheet Metal Works, Inc.*, 159 B.R. 840, 846 (Bankr.S.D.Ill. 1993); *see also Interwest*, 23 F.3d at 317. Even assuming the wording of § 327(c) requires an objection from a creditor or from the U.S. Trustee before the court can examine conflicts arising from the simultaneous representation of a creditor and a trustee, a conclusion with which we do not agree, § 327(a) does not include similar language. *Interwest*, 23 F.3d at 317. Review of the Bankruptcy Code sections regarding professionals indicates a consistent statutory scheme to give the bankruptcy judge discretion and power to ensure professionals are disinterested and do not represent interests adverse to the estate. Section 328(c) specifically grants the bankruptcy judge discretion to deny compensation to a professional if at any time during employment the professional represents or holds an interest adverse to

---

**1.** Winship claims a second attempt to disqualify him was made in 1993 before Judge Mai. While Judge Mai mentioned the fact of dual representation in his order denying Ray and Alan Cook's discharges, the record on appeal does not contain any corresponding motion to disqualify. Thus, only three such motions are in the record before us.

the interest of the estate. Thus, §§ 327(a) and 328(c) give the bankruptcy court the responsibility and power to oversee professionals involved in a bankruptcy case without any requirement that the issues be raised by a party in interest. *Id.* In any event, in this admittedly unusual case, the Debtors would appear to be are parties in interest since they are entitled to and have received money from the estate.

### B. Disgorgement of Fees.

Once a professional person complies with the disclosure requirements of Rule 2014 and satisfies the standards of § 327, the professional may be retained by court order. As § 328(c) makes clear, however, the need for self-scrutiny and avoidance of conflicts does not end when the professional's employment application is approved. Section 328(c) provides that:

> Except as provided in section 327(c), 327(e), or 1107(b) of this title, the court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 or 1103 of this title if, at any time during such professional person's employment under section 327 or 1103 of this title, such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.

This provision gives the bankruptcy court discretion to deny compensation and reimbursement to a professional who had a conflict of interest. If it is determined that a professional employed by the estate was not disinterested, or held or represented an interest adverse to the estate at any point during the course of the representation, the court may deny fees and expenses. *Gray v. English,* 30 F.3d 1319, 1323–24 (10th Cir. 1994); *see also Jensen v. United States Trustee (In re Smitty's Truck Stop, Inc.),* 210 B.R. 844, 850 (10th Cir. BAP 1997) (failure to investigate and disclose that source of prepetition retainer paid to debtor's attorney was creditor's cash collateral required disgorgement of retainer and denial of fees even though attorney was not aware of source of

retainer and conflicting claims to the funds). Thus, § 328(c) authorizes a "penalty" for failing to avoid a disqualifying conflict of interest. *Rome v. Braunstein,* 19 F.3d 54, 58 (1st Cir.1994).

The bankruptcy court based its decision to require total disgorgement of fees and expenses on two factors: Winship's failure to disclose the contingent fee arrangement with Darrah, and the court's inability to distinguish which services provided were colored by Winship's representation of Darrah. Winship argues that disclosure of his attorney-client relationship inferred a fee arrangement and that, since his contingent fee arrangement with Darrah did not create an interest adverse to the estate, Rule 2014 did not require its disclosure. We disagree.

"Attorneys who request court approval of employment pursuant to § 327 of the Bankruptcy Code owe a duty to disclose actual or potential conflicts of interest which may bear upon their qualifications as set forth therein." *In re Roberts,* 75 B.R. 402, 410 (D.Utah 1987). The bankruptcy court has no duty to investigate to determine that a prospective attorney does not have an actual or potential conflict of interest, even if the conflict might be revealed elsewhere in the court file; it is the attorney's duty to disclose the relevant details in the application for employment. *Id.; see also Smitty's Truck Stop,* 210 B.R. at 849 (same rule applies to debtor's attorney under § 329 and Rule 2016(b)).

> The purpose of such disclosure is to permit the Court and parties in interest to determine whether the connection disqualifies the applicant from the employment sought, or whether further inquiry should be made before deciding whether to approve the employment. This decision should not be left to counsel, whose judgment may be clouded by the benefits of the potential employment.

*In re Lee,* 94 B.R. 172, 176 (Bankr.C.D.Cal. 1988). Thus, there is no merit to Winship's argument that he did not have to disclose his fee arrangement with Darrah because he did not believe it added to the conflict of interest that § 327(c) indicates is not otherwise a sufficient ground for disqualification. Win-

ship's contingent fee arrangement with Darrah gave him a direct personal pecuniary interest in Darrah's claim, beyond the mere professional interest an attorney ordinarily has in his client's claim. In essence, the arrangement made him a creditor of all the related estates, or so close to one that we think the distinction should make no difference. Furthermore, if he were allowed to be paid for his services out of the Debtors' estate, his contingent fee from Darrah would pay him a second time for much of the same work.

Absent the spontaneous, timely, and complete disclosure required by § 327(a) and Rule 2014, court-approved counsel proceed at their own risk. *Rome,* 19 F.3d at 59. Where the professional maintains any connections proscribed by § 327(a) and does not disclose those connections, the attorney should expect nothing more than the denial of compensation requested and disgorgement of fees received. *See Smith v. Marshall (In re Hot Tin Roof, Inc.),* 205 B.R. 1000, 1003 (1st Cir. BAP 1997) and cases cited therein. Winship's failure to disclose the contingent fee agreement with Darrah provided sufficient ground for the bankruptcy court's discretionary denial of his compensation under § 328(c).

Winship further argues that, even if the bankruptcy court was correct that an actual conflict existed, disgorgement of all fees was not warranted since there was no evidence of harm and that his services provided a significant benefit to the estate. However, we review not the quality of his representation, but his application for employment as it was presented to the bankruptcy court. *Interwest,* 23 F.3d at 317 (citing *In re Martin,* 817 F.2d 175, 183 (1st Cir.1987)). "A fiduciary ... may not perfect his claim to compensation by insisting that, although he had conflicting interests, he served his several masters equally well or that his primary loyalty was not weakened by the pull of his secondary one." *Woods v. City Nat'l Bank & Trust Co.,* 312 U.S. 262, 269, 61 S.Ct. 493, 85 L.Ed. 820 (1941). Where there has been a clear failure to make timely disclosure of all facts material to a potential conflict of interest, counsel appointed pursuant to § 327 can claim no right to a lesser sanction than the bankruptcy court is authorized to impose pursuant to § 328(c). *Rome,* 19 F.3d at 62–63; *see also Smitty's Truck Stop,* 210 B.R. at 850 (failure to investigate and disclose conflicting claims to money paid as prepetition retainer warranted disgorgement of retainer and denial of fees).

There is no bright line rule invariably requiring denial of all compensation under § 328(c). *See Gray v. English,* 30 F.3d at 1324 ("In exercising the discretion granted by the statute we think the court should lean strongly toward denial of fees, and if the past benefit to the wrongdoer fiduciary can be quantified, to require disgorgement of compensation previously paid that fiduciary even before the conflict arose."). Where, as in this case, counsel has served under a less-than-fully-disclosed conflict of interest, the bankruptcy court cannot always assess with precision the effect the conflict may have had, either on the results achieved or the results that might have been achieved by following "the road not taken." *Rome,* 19 F.3d at 62–63. Based on the history of these proceedings, particularly the improvident motions to sell property and the terms of the settlement agreement, the bankruptcy court acted well within its discretion in finding that Winship's services were improperly colored by his relationship with Darrah and that it could not determine which services were not tainted by the conflict.

We further note that, under the circumstances of this case, we are not swayed by Winship's resort to general notions of equity. Pursuant to his contingent fee agreement, Winship should have received approximately $77,000 from the $233,000 partial distribution the Trustee made to Darrah from the Debtors' estate. This is in addition to the $68,000 or so he has been paid by the estate as counsel for the Trustee. Once he returns this amount to the Debtors' estate, Winship can nevertheless be expected to receive one-third of Darrah's one-half of that amount, or approximately $11,000. This accounting does not include any other compensation he may

receive from Darrah's share of the three related estates or any other money that may be distributed from the Debtors' estate. Winship's efforts in these proceedings will not go completely uncompensated.

## IV. Conclusion.

The bankruptcy court's order disqualifying Winship as counsel for the Trustee and requiring him to disgorge all fees and expenses previously paid to him by the Trustee is AFFIRMED.