### In re ANGELIKA FILMS 57TH INC., Debtor.

**Bankruptcy No. 96 B 41643(AJG).**

United States Bankruptcy Court, S.D. New York.

Nov. 9, 1998.

---

**32**

Jaspan, Schlesinger, Silverman & Hoffman LLP, by Gary F. Herbst, Garden City, NY, for trustee.

Tenzer & Greenblatt, L.L.P., by James D. Glass, Michael Z. Brownstein, Gerard R. Luckman, New York City, pro se.

Platzer, Swergold, Karlin, Levine, Goldberg & Jaslow, LLP, by Steven D. Karlin, New York City, for Angelika Films Center, Inc.

Zivyak, Klein & Liss, by Jeffrey L. Zivyak, New York City, for Joseph Saleh.

United States Trustee, by Goodwin Benjamin, New York City.

*MEMORANDUM OF DECISION REGARDING APPLICATION OF TENZER GREENBLATT LLP FOR FIRST AND FINAL ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED*

ARTHUR J. GONZALEZ, Bankruptcy Judge.

The issue before the Court is whether debtor's counsel is entitled to compensation and reimbursement of expenses for services rendered on behalf of the debtor-in-possession and the debtor pursuant to 11 U.S.C. § 330.[1] At a hearing on the final applications for allowance of compensation and reimbursement of expenses, the Court questioned the disinterestedness of counsel based upon certain actions it took which resulted in the filing of a motion to assume and assign the lease to the debtor's principal at a price of $100,000, a price that was substantially below what counsel had, a few days earlier, claimed was the market value of the lease. Based on the conduct of counsel, the Court finds that from the inception of the case counsel was not disinterested and represented an interest adverse to the estate, thereby disqualifying it from representing the debtor. Alternatively, even if debtor's counsel was qualified to represent the debtor at the commencement of the case, because of counsel's failure to avoid conflicts of interest, the Court finds that counsel lost its disinterest-

---

**1.** Hereinafter, unless otherwise indicated, all section references are to title 11 of the United States Code.

edness and represented an interest adverse to the estate at the time it filed a motion to assume and assign the lease to the debtor's principal. Under either alternative finding, the Court disallows the entire request for compensation and reimbursement of expenses for services rendered by debtor's counsel.

## BACKGROUND

Angelika Films 57th, Inc. ("Angelika 57th" or the "Debtor") was in the business of operating a single-screen movie theater in Manhattan when a bitter divorce dispute erupted between the Debtor's principal Joseph Saleh, and his estranged wife, Angelika. In 1995, Mr. Saleh's wife and daughters temporarily ousted him from control of the Debtor and, among other things, caused the Debtor to execute and deliver to Angelika Film Centers, Inc. ("AFC") a secured promissory note and security agreement. AFC was an affiliate of the Debtor controlled by Mr. Saleh's wife and daughters. Thereafter, in early 1996, AFC filed an action in replevin in the New York State Supreme Court, claiming it was owed in excess of $700,000. The Debtor had few assets other than a below-market lease located at 57th Street in Manhattan, which had an estimated market value of at least $500,000.[2] Angelika 57th filed a petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code" or the "Code") on March 28, 1996.

## FACTS

In March 1996, Tenzer Greenblatt LLP ("Tenzer") sought to represent the Debtor in its chapter 11 case. In Tenzer's retention application, it disclosed that it was already representing the Debtor in the replevin action and representing Joseph Saleh in several personal matters, including his matrimonial dispute. AFC objected to the retention of Tenzer as general counsel, arguing that Tenzer lacked disinterestedness because it was a creditor and because it had close ties to Mr. Saleh which created conflicts of interest and made Tenzer unable to render independent advice as a fiduciary to the Debtor's creditors. The Office of the United States Trustee (the "U.S. Trustee") also objected to the retention of Tenzer as counsel, although its objection was based strictly on the terms of the retainer agreement.[3] Mr. Saleh subsequently paid all non-bankruptcy fees to Tenzer to satisfy the non-creditor requirement of disinterestedness. In May 1996, the parties agreed to Tenzer's retention as counsel to the Debtor, and the Court "so ordered" a stipulation reflecting that agreement.

In October 1996, AFC moved to convert the bankruptcy case from a chapter 11 to a chapter 7 proceeding, or, in the alternative, for an order appointing a chapter 11 trustee ("Motion to Convert"). In its Motion to Convert, AFC alleged that the Debtor was sustaining monthly losses and was unlikely to reorganize, that Mr. Saleh had used postpetition funds to pay prepetition obligations, that Mr. Saleh had used both prepetition and postpetition funds to pay personal expenses, and that a Chapter 7 Trustee was needed to investigate any fraud and halt the continued "bleeding" of the Debtor.

On November 14, 1996, prior to the commencement of the hearing on the Motion to Convert, a chambers conference was held. Following that conference, the parties reached an agreement which was to be set forth in a proposed order and submitted to the Court by AFC for signature. Under that agreement, the Debtor consented to the appointment of a chapter 11 trustee if it failed

---

**2.** In January 1997, Lansco, a real estate brokerage retained by the Debtor to market the lease, estimated the potential market value of an assignment of the lease at $500,000 to $750,000, or more.

**3.** The retention agreement between the Debtor and Tenzer provided that the firm's retainer would be paid in five installments in the form of deposits by Mr. Saleh's mother after the case was commenced. The U.S. Trustee objected that the retainer arrangement resembled that of a postpetition retainer, which typically is not viewed favorably by courts. The U.S. Trustee further argued that the manner of payment raised concerns as to whether Ms. Saleh would consider the payments a loan to the Debtor entitled to administrative priority. The U.S. Trustee later withdrew its objection based on the Debtor's representation that Ms. Saleh would be treated as an unsecured creditor. Tenzer received a retainer of $22,000 under the retention agreement.

to file a motion in "good faith" to assume and assign the lease by January 31, 1997.[4] An order to that effect was entered on December 18, 1998 (the "Consent Order"). In exchange, AFC consented to the continued management of the Debtor by Amelia Management, a management company of which Mr. Saleh owned eighty percent (80%) of the stock.

The agreement on the Motion to Convert did not resolve the dispute between the Debtor and AFC as to whether AFC was a creditor of the Debtor. At issue were the bona fides of a July 1995 note and security agreement. In November 1996, AFC filed a proof of claim for $700,000 based upon the Debtor's alleged obligation under the note. The Debtor responded that AFC's claim was fraudulent and asserted that the alleged debt arose during the period when Mr. Saleh's wife and daughters wrongfully ousted him from control of the Debtor and convened an unauthorized meeting of directors where they voted to execute on the note.

As for the Debtor's efforts to assume and assign the lease, by late January 1997, the Debtor had not found a buyer. On January 22, 1997, the Debtor filed a motion to extend the Consent Order's January 31st deadline to March 5th ("Motion to Extend"). The Debtor's main arguments were that: 1) it would be "unjust" to enforce the Consent Order's deadline because AFC's proof of claim was fraudulent, and, therefore, AFC lacked standing to move to convert or appoint a trustee; 2) the Debtor had complied with substantially all of the terms of the order, and the deadline was relatively unimportant; 3) a trustee would not know how to run a theater, and, therefore, the Debtor would post losses and the value of the estate would be diminished; and 4) the Debtor should be afforded a meaningful opportunity to market the lease, which had become difficult during the holiday season. The Debtor also argued that it had one prospective buyer who could not commit to the purchase before February 15, 1997.

On January 27, 1997, a hearing was held on the Motion to Extend and it was denied by the Court that day. The Court based its decision, in part, on the fact that the Consent Order reflected the parties' bargained-for agreement, and that there had been no change in circumstances which could not have been foreseen by the Debtor. Further, the Court rejected the Debtor's contentions that a trustee could not effectively market the lease or operate the theater. As to the marketing of the theater, it was already being marketed by a real estate broker and the broker could perform the same function for a trustee. With respect to the operation of the theater, the Court noted that the theater was being operated by a management company which a trustee, if appointed, could seek to continue to retain.

On the issue of AFC's standing to file the underlying motion to convert or appoint a trustee, the Debtor raised the issue of newly discovered evidence which, it alleged, would establish that AFC's claim was fraudulent. However, the Debtor declined to pursue the issue further in the context of the Motion to Extend and asserted that it would be addressed in a pending adversary proceeding against AFC.

On January 28, 1997, the Court met with attorneys for the parties to discuss the procedures for securing an order directing the appointment of a trustee if a motion to assign the lease were not filed by January 31st. No mention was made to the Court at that time of Mr. Saleh's intent to submit a purchase proposal. Yet Tenzer attorney James D. Glass later stated that, on January 27, 1997, immediately after the Court denied the Motion to Extend, he first contemplated a bid by Mr. Saleh and, prior to leaving the Courthouse that day, so advised his associate and a representative of Lansco. (James D. Glass, Transcript, Hearing, March 23, 1998 at 56.) The Tenzer associate who was so advised was the same attorney who appeared at the conference on January 28th and who prepared the motion concerning Mr. Saleh's purchase

---

4. The Debtor objected to the terms of the proposed order submitted by AFC and submitted a counter-order. The parties appeared before the Court on December 18, 1996 to resolve the dispute over the wording of the order. The dispute was resolved by inserting, at AFC's request, the term "good faith" into the Debtor's counter-order.

proposal. In fact, Tenzer's time records for January 27th contain an entry by Mr. Glass stating, "Joe [Saleh] should make $100,000 offer to prime the pump." Mr. Glass made another entry on January 28 stating, "Saleh coming into office today to make offer ... give 10% deposit, 10% breakup fee." Each entry reflected a conversation with the Tenzer associate.

On January 31, 1997, Debtor's counsel filed a motion to assume and assign the lease to Mr. Saleh ("Motion to Assign") at a purchase price of $100,000. The sale agreement provided that the purchase would be subject to an auction, on the condition that a successful higher bidder pay a $10,000 break-up fee to Mr. Saleh. The agreement also gave the Debtor an opportunity to reject any bid. Finally, the agreement gave Mr. Saleh the right to abandon the agreement with a liquidated damage payment of his $10,000 deposit. Debtor's counsel argued that Mr. Saleh's purchase proposal resulted from a "good faith arms length transaction" because Mr. Saleh had disclosed his insider status, the sale was subject to an auction, and the Debtor had sought modifications to the lease to maximize its value.

AFC opposed the Motion to Assign, arguing that it was not made in good faith nor at arms length because: 1) the purchase price was far below market value; 2) the Debtor had never indicated that if the court denied the Motion to Extend, it would sell to Mr. Saleh; 3) the Debtor had argued that a "major NYSE company" wanted the lease; 4) requests for modifications to the lease were made after the assignment motion was filed; 5) the agreement contained many clauses permitting Mr. Saleh to withdraw from the deal; 6) the agreement provided inadequate assurance that Mr. Saleh could consummate the purchase or otherwise perform; 7) the potential forfeiture of the $10,000 was not detrimental to Mr. Saleh because such funds would be used for administrative claims, primarily Debtor's counsel's fees which he was guaranteeing; and 8) the agreement included a break-up fee payable to Mr. Saleh.

On March 6, 1997, the Court denied Debtor's Motion to Assign on the grounds that it was not filed in good faith. The Court based its finding regarding good faith, in part, on the fact that the purchase of the lease for $100,000 was proposed only four days after Debtor's counsel represented it was worth at least $500,000. The Court also held that the Debtor had not exercised its business judgment in good faith, noting that Mr. Saleh's offer was so low that it could adversely affect the bidding and reduce the ultimate return to the estate at an auction. Further, the Court found that the Motion to Assign was an act done solely to protect the interests of the principal, Mr. Saleh.

The Debtor then requested a stay pending appeal and the appointment of an examiner instead of a trustee, arguing that: 1) the Debtor should have been granted an evidentiary hearing regarding the appointment of a trustee; 2) there was no basis for the Court's finding on lack of good faith; and 3) a trustee would generate much higher administrative expenses than an examiner by employing accountants, attorneys, and other personnel. The Court rejected the Debtor's arguments that the appointment of a trustee would be harmful to the estate and denied the stay.[5] In accordance with the Debtor's bargained-for agreement with AFC, a chapter 11 trustee was appointed. The U.S. Trustee selected Kenneth P. Silverman as the chapter 11 trustee (the "Chapter 11 Trustee").

In March 1997, the Debtor appealed the decision to the District Court, arguing, among other things, that the bankruptcy court was required to hold an evidentiary hearing before appointing the trustee. The District Court affirmed this Court's decision, holding that: 1) the correct standard had been applied in denying the Motion to Assign

5. The Court held, "Under the circumstances of this case, when you have a Debtor using a management company, ... a real estate agent to market the lease and ... the lease is unlikely to be successfully marketed . . for its present use, it makes no difference whether a Trustee does that or a Debtor.

The Debtor is not so essential that if a Trustee were to take over that role, it would cause the [irreparable] harm that you're articulating...." (Hearing on stay pending appeal following denial of Motion to Assign, March 6, 1997 at 28.)

for lack of good faith; 2) the findings on lack of good faith were fully supported by the record and not clearly erroneous; 3) under the facts of this case, an evidentiary hearing was not required before finding an absence of good faith and before appointing a trustee; and 4) the bankruptcy court had no obligation to advise appellant how to modify its motion so that the Court would find it had been filed in good faith. The District Court went further, noting that the circumstances "reeked of bad faith" and that the court "could find that there was fraud or collusion between appellant and Saleh . . . ."[6]

In May 1997, two months after his appointment, the Chapter 11 Trustee filed a motion to assume and assign the lease, subject to higher and better offers, with an initial bid of $500,000 for the lease made by Purple & White ("P & W"), a supermarket chain. At the July 10th hearing to approve the sale of the lease, competitive bidding occurred which ultimately resulted in P & W raising its offer to $1,000,000. The Court found that bid to be the highest and best offer and thereafter, the lease was assumed and assigned to P & W.

From October to December 1997, the various professionals submitted applications for compensation. The Chapter 11 Trustee sought $50,000 in commissions, and his attorneys, Jaspan, Schlesinger, Silverman & Hoffman, sought just more than $30,000 in fees. Lansco, the real estate brokers, sought less than $4,000. Platzer, Swergold, Karlin, Levine, Goldberg & Jaslow ("Platzer"), the attorneys for AFC, filed a motion under § 503(b) to recover approximately $140,000 in fees for its substantial contribution to the estate. Tenzer sought compensation and reimbursement of expenses incurred and projected totaling $491,141.44.[7]

Prior to the hearing on those applications, AFC, Joseph Saleh, the Chapter 11 Trustee, and the Debtor engaged in settlement discussions as to: 1) AFC's claim; 2) amounts to be distributed to creditors and equity holders; and 3) professional fees. The proposed settlement provided for a reduction in Tenzer's fees to $285,000 – $300,000 and in Platzer's fees to $130,000.[8] On December 23, 1997, a motion approving the settlement set forth above was granted and entered on December 24, 1997. However, although the settlement agreement resolved the issues among the parties, they were advised that the Court remained bound to review the professional fees and trustee commissions. Further, they were advised that the settlement had no effect on the rights of the U.S. Trustee to file an objection to any of the amounts to be awarded.

On December 31, 1997, the Court held a hearing on all applications for commissions, fees, and expenses. The Court granted the requests in accordance with the settlement agreement except it declined to hear Tenzer's application for fees without first determining whether the firm remained disinterested throughout the case. The Court stated

6. "Here, given that Saleh is appellant's sole principal, and given the circumstances which gave rise to the assignment motion, which reeked of bad faith—including that appellant did not tell the Bankruptcy Court a mere four days before it filed its motion that it was planning on assigning the lease to its sole principal—the Court could find that there was fraud or collusion between appellant and Saleh, and that appellant filed the assignment motion solely for Saleh's benefit and to avoid the appointment of a trustee." Opinion and Order, J. Mukasey, United States District Court, S.D.N.Y., May 27, 1997 at 17.

7. Tenzer requested $451,281.50 for professional legal services rendered through November 25, 1997; $15,000 for estimated future professional legal services after November 25, 1997; and $24,859.94 in reimbursements for necessary costs and expenses incurred. The fee request included prepetition fees of $13,034.

8. Tenzer sought the entire amount set forth above in its application, even though the estate would only be obligated to pay a maximum of $300,000 in fees and reimbursement of expenses to Tenzer. It applied for the entire amount because Mr. Saleh could be called upon to pay the balance under the guaranty agreement with him. Thus, although Tenzer might not collect any amount in excess of $300,000 from the estate, it could look to Mr. Saleh for the amount approved, but not paid. At the hearing on March 23, 1998, Tenzer advised the Court that it no longer sought the Court's approval for the fees and reimbursement of expenses, set forth in the application, in excess of $300,000 because it had reached an accord with Mr. Saleh as to any claims that may exist between him and Tenzer.

then that it thought Tenzer may have lost its disinterestedness at some point in the case, perhaps when it made the Motion to Extend or, if not, possibly when it made the Motion to Assign. The Court also indicated that, if Tenzer was found to have lost its disinterestedness, then the Court would look to Bankruptcy Code § 328(c)[9] to see what adjustments needed to be made to the fees.

From January through March 1998, Tenzer submitted affidavits in support of its position that it was disinterested at the outset of its retention and remained disinterested throughout the entire period at issue[10] from James D. Glass; a Lansco representative; the Chapter 11 Trustee;[11] Jeffrey L. Zivyak, counsel for Joseph Saleh in these proceedings; and Allen Bodner, counsel for Joseph Saleh regarding his offer to purchase the lease. The U.S. Trustee filed a statement arguing that certain actions taken by Tenzer were adverse to the interests of the estate but leaving to the Court's discretion the amount of any reduction in excess of the amount agreed upon by the parties. A hearing on the issue of disinterestedness was also held in this court on March 20, 1998. After a consideration of the record, the Court finds that Tenzer was not disinterested and represented an interest adverse to the estate from the inception of the case. Alternatively, even if Tenzer was disinterested and did not represent an interest adverse to the estate at the beginning of the case, it no longer fulfilled these requirements at the time it sought to assume and assign the lease to Joseph Saleh. Under either alternative find-

ing, the Court determines that Tenzer's egregious conduct warrants denial of its application for compensation and reimbursement of expenses.

### DISCUSSION

■ Prior to addressing the issue of whether Tenzer is entitled to compensation and reimbursement of expenses for services rendered pursuant to § 330,[12] the Court must first determine whether the applicant was qualified and, if so, maintained its qualification to be employed as counsel to the chapter 11 debtor throughout the period at issue.

### *Section 327(a) of the Bankruptcy Code*

■ In order to qualify for employment as counsel to a chapter 11 debtor, an attorney must satisfy the requirements set out in the Bankruptcy Code. Section 327(a) of the Code provides a two-prong test. First, the debtor's attorney must not hold or represent an interest adverse to the bankruptcy estate. Second, the debtor's attorney must be a disinterested person. *See In re Leslie Fay Cos., Inc., et al.,* 175 B.R. 525, 531 (Bankr. S.D.N.Y.1994).

■ The Code defines a "disinterested person" as one who is not a creditor, equity shareholder, or insider, and who "does not have an interest materially adverse to the interest of the estate or any class of creditors ... by reason of any indirect or direct relationship to, connection with, or interest in,

---

9. Section 328(c) states, in pertinent part, that "the court may deny allowance of compensation for services and reimbursement of expenses of a professional person ... if, at any time during such professional person's employment ... such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate...."

10. Although the Court first raised the disinterestedness issue in the context of Tenzer's actions that may have resulted in it losing that status at a particular point in the case, Tenzer's responsive pleadings, documents, and testimony addressed its disinterestedness status at the time of its retention and thereafter.

11. In the Chapter 11 Trustee's affidavit, he stated that Tenzer had fully cooperated with his office

during his tenure. Further, while he had no personal knowledge of the facts and circumstances in this case prior to his appointment, he was not aware of any facts or circumstances that would refute any of the statements in Mr. Glass's affidavit presented for the March 1998 hearing.

12. In its application Tenzer placed before the Court, pursuant to § 330, fees and reimbursement of expenses in the amount of $491,141.44, including prepetition fees of $13,034. A settlement among the parties resulted in Tenzer seeking an award from the Court in the amount of $300,000, inclusive of all fees and reimbursement of expenses without reference to the pre or postpetition period. Therefore, the Court treats Tenzer's request for $300,000 as being a request for fees and reimbursement of expenses entirely incurred during the postpetition period.

the debtor . . . ." § 101(14)(A) & (E). "The later portion of the definition . . . is sufficiently broad to include any professional with an 'interest or relationship that would even faintly color the independence and impartial attitude required by the Code.'" *Kravit, Gass & Weber v. Michel (In re Crivello),* 134 F.3d 831, 835 (7th Cir.1998) (citing *In re BH & P, Inc.,* 949 F.2d 1300, 1308 (3d Cir.1991)). Thus, the "disinterestedness" prong of the test, insofar as it precludes counsel with an "interest materially adverse," overlaps with the requirement that counsel not hold or represent any interest adverse to the estate. *See In re Martin,* 817 F.2d 175, 179–80 (1st Cir.1987) ("the twin requirements of disinterestedness and a lack of adversity telescope into a single hallmark").

In *Leslie Fay,* the court adopted the definition of disinterestedness set out by the First Circuit in *Martin. See Leslie Fay,* 175 B.R. at 533. The court in *Martin* held that whether an attorney is disinterested depends on whether that attorney has "either a meaningful incentive to act contrary to the best interests of the estate and its sundry creditors—an incentive sufficient to place those parties at more than acceptable risk—or the reasonable perception of one." *Martin,* 817 F.2d at 180–81. A disinterested person, the court noted, "should be divested of any scintilla of personal interest which might be reflected in his decision concerning estate matters." *Id.* at 181 (*quoting, In re Codesco, Inc.,* 18 B.R. 997, 999 (Bankr.S.D.N.Y.1982)). The Court in *Rome v. Braunstein,* 19 F.3d 54, 58 (1st Cir.1994), also adopted the *Martin* approach, considering the test an exercise of the bankruptcy court's ongoing affirmative responsibility to "root out impermissible conflicts of interest" under §§ 327(a) and 328(c).

■ What it means to "hold an interest adverse to the estate" is not defined in the Code, nor does the Code provide any guidance on the issue. However, the issue has been discussed widely by the courts. The court in *In re Granite Partners, L.P.,* 219 B.R. 22, 33 (Bankr.S.D.N.Y.1998), noted that to hold an adverse interest has come to mean "either (1) the possession or assertion of any economic interest that would tend to lessen the value of the bankruptcy estate or [that would] create either an actual or potential dispute with the estate as a rival claimant, or (2) a predisposition of bias against the estate." *Id; See also In re Roberts,* 46 B.R. 815, 827 (Bankr.D.Utah 1985); *In re Star Broad. Inc.,* 81 B.R. 835, 838 (Bankr.D.N.J. 1988); *In re Envirodyne Indus., Inc.,* 150 B.R. 1008, 1016–17 (Bankr.N.D.Ill.1993); *Crivello,* 134 F.3d at 835.

■■ What it means to represent, as opposed to hold, an adverse interest under § 327 was addressed by the *Envirodyne* court: "to represent an adverse interest means to serve as agent or attorney for any individual or entity holding such an adverse interest." *Envirodyne,* 150 B.R. at 1016–17. It is well settled that the debtor-in-possession has a duty to act in the interests of the estate. *See Hansen, Jones & Leta v. Segal,* 220 B.R. 434, 449 (D.Utah 1998). If the debtor-in-possession fails to do so, it holds an adverse interest. Consequently, counsel for that debtor-in-possession represents an adverse interest and may be disqualified as counsel.

■ The determination of adverse interest is objective and is concerned with the appearance of impropriety. *See Rome,* 19 F.3d at 58 (noting that "[t]he test is neither subjective, nor significantly influenced by the court-appointed professional's 'protestations of good faith,' . . . but contemplates an objective screening for even the 'appearance of impropriety'"). The duty to avoid even the appearance of impropriety is a persistent theme in disinterestedness cases. It is also stated in the New York Code of Professional Responsibility, Canon 9. *See Granite,* 219 B.R. at 34. Several courts have argued that the disinterestedness requirement was intended to "prevent even the appearance of conflict irrespective of the integrity of the person or firm under consideration." *Martin,* 817 F.2d at 180–81 (*quoting, Codesco,* 18 B.R. at 999.) The court in *Rancourt,* 207 B.R. 338, 359 (Bankr.D.N.H.1997), went so far as to say that, because "section 327(a) is designed to limit even appearances of impropriety to the extent reasonably practicable, doubt as to whether a particular set of facts gives rise to a disqualifying conflict of inter-

est normally should be resolved in favor of disqualification."

■ Generally, courts discuss conflicts of interest and disinterestedness in the same breath. In fact, some courts regard counsel's failure to avoid conflicts of interest as evidence of counsel's lack of disinterestedness. For instance, the court in *In re Spanjer Bros., Inc. ("Spanjer I")*, 191 B.R. 738, 753 (Bankr.N.D.Ill.1996), held that the very purpose of the statute requiring disinterestedness was to ensure that attorneys employed by the estate had no conflicts of interest with the estate, and that the rule was strictly enforced because it impacted the integrity of the bankruptcy system as a whole. *See also In re Tinley Plaza Assoc.*, 142 B.R. 272, 277 (Bankr.N.D.Ill.1992); *See generally In re Kendavis Int'l, Inc.*, 91 B.R. 742, 744 (Bankr.N.D.Tex.1988). The duty to avoid conflicts of interest is ongoing. In reviewing the Chapter 7 attorney's application for fees under § 328(c), the *Rome* court noted, "[t]he need for professional self-scrutiny and avoidance of conflicts of interest does not end upon appointment." *Rome*, 19 F.3d at 57–58.

Some courts have made a distinction between "actual" and "potential" conflicts of interest in determining whether counsel is qualified to represent the debtor. The court in *TWI Int'l v. Vanguard Oil & Serv. Co.*, 162 B.R. 672, 675 (S.D.N.Y.1994), held that an attorney should be disqualified from employment under § 327 only when an actual, as opposed to a hypothetical or theoretical, conflict is present. However, the court held, this does not preclude disqualification for a potential conflict of interest, so long as the potential conflict is a potential actual conflict. *Id.* The distinction between "potential" and "hypothetical" conflicts merely confuses the analysis, and several courts have rejected it as artificial. *See Leslie Fay*, 175 B.R. at 532 ("The debate over this issue may be more semantic than substantive . . . .").

■ What is clear is that undivided loyalty is central to disinterestedness. The court in *Rome* noted that requirements of § 327 "serve the important policy of ensuring that all professionals ... tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibili-

ties." *Rome*, 19 F.3d at 58; *Accord Leslie Fay*, 175 B.R. at 532; *Crivello*, 134 F.3d at 836; *Envirodyne*, 150 B.R. at 1016. This view is consistent with New York Code of Professional Responsibility Disciplinary Rule 5–105, which forbids an attorney from commencing or continuing simultaneous representation of two clients if his exercise of independent professional judgment on behalf of either would likely be adversely affected, or where the dual representation would likely involve the representation of "differing interests," defined to include "every interest that will adversely affect either the judgment or the loyalty of a lawyer to client, whether it be a conflicting, inconsistent, diverse or other interest." *Granite*, 219 B.R. at 33–34 n. 12.

Generally, the interests of a debtor's estate and a debtor's principal must diverge before a counsel's divided loyalty is evidenced. In *Rancourt*, the court halved the compensation awarded to counsel for the debtor-in-possession as a sanction for failing to disclose such diverging interests and for taking actions which preserved personal benefits for the individual debtor but led to a collapse of efforts to achieve a plan of reorganization that might have resulted in greater distribution to creditors. *Rancourt*, 207 B.R. at 356.

■ Counsel for a chapter 11 debtor owes a fiduciary duty of loyalty and care to his client, which is the debtor-in-possession, not the debtor's principals. *See Rancourt*, 207 B.R. at 360 ("When representing the debtor-in-possession, its attorney has a duty to look to the interests of the estate and not to the interests of its principals.").

■ Ultimately, the determination of counsel's disinterestedness is a fact-specific inquiry. *TWI*, 162 B.R. at 675. It is the court's duty to review the attorney's conduct for circumstantial evidence of bias in such cases and determine if a conflict of interest exists. *See Hansen*, 220 B.R. at 470, *Spanjer I*, 191 B.R. at 751. *See also In re Garza*, 1994 WL 282570 at *2 (Bankr.E.D.Va.) ("courts have generally declined to formulate bright-line rules ... favoring instead an approach which evaluates the facts and circumstances of each particular case").

The facts and circumstances taken into consideration may include whether counsel's services provided any benefit to the estate. As noted in *Crivello*, "the bankruptcy courts are courts of equity. . . . It is conceivable that even an interested professional may provide services which are beneficial to the estate." *Crivello*, 134 F.3d at 838. However, where an attorney represents the interests of the debtor's principals to the exclusion of other constituents, the court may conclude that he not only failed to remain disinterested; he also failed to perform services which were "reasonably likely to benefit the debtor's estate" under § 330 of the Bankruptcy Code. *See Hansen*, 220 B.R. at 466.

### Tenzer's representation of an interest adverse to the estate and lack of disinterestedness under § 327(a)

Judged against the standards set out above, the Court concludes that Tenzer was not disinterested and represented an interest adverse to the estate from the inception of this case. A review of the circumstantial evidence of Tenzer's conduct establishes that it had decided at the commencement of the case that the interests of Mr. Saleh, the Debtor's principal, would be paramount to those of the Debtor.

Initially, the Court approved Tenzer's retention because Tenzer had disclosed its relationship with Joseph Saleh and had resolved all the objections to its proposed retention. In addition, although aware that a potential conflict of interest existed, the Court believed that Tenzer recognized its obligation to represent the interests of the Debtor and that it would take appropriate actions to ensure that the Debtor's interests were protected if the interests of the Debtor and Mr. Saleh diverged. In reliance on Tenzer pursuing the appropriate course, the Court approved its retention. The facts establish that the Court's reliance was misplaced.

In assessing the various actions taken by Tenzer in its representation of the Debtor,

the Court concludes that Tenzer always had a predisposition to take actions to protect the interests of Mr. Saleh, even if those actions were contrary to the interests of the Debtor. Therefore, Tenzer's representation of the Debtor and Mr. Saleh constituted an actual conflict of interest from the inception of the case. In reaching that conclusion, the Court recognizes that in chapter 11 cases involving closely-held corporations, such as this case, proposed bankruptcy counsel often has a pre-existing relationship with the principal of the debtor. That relationship may make it difficult for an attorney to determine at each turn when the interests of the debtor and those of the principal are aligned, or are in conflict. However, in this case, we are not in a "gray area" regarding issues of conflicts of interest that may confront counsel in the course of its representation of a closely-held corporation. Rather, the instant case involves circumstances in which the interests of the Debtor and of the principal clearly diverged yet counsel chose to promote the interests of the principal to the detriment of the Debtor—a choice that Tenzer apparently made at the commencement of its representation of the Debtor.

The actions taken by Tenzer which evidence the actual conflict, include: 1) the arrangement whereby the retainer agreement was funded by Ms. Saleh; 2) the guaranty by Mr. Saleh to pay Tenzer's attorney fees; 3) the management contract with Amelia Management, a company controlled by Joseph Saleh;[13] and 4) the filing of the Motion to Assign. When considered separately, each action taken by Tenzer prior to its filing the Motion to Assign was not unusual in a case involving a closely-held corporation. Nor would it be unusual for the Court to approve such action, recognizing that as a practical matter a level of tension between the interests of a debtor and its principal may need to be tolerated. However, the sum total of Tenzer's actions, as amplified by the testimony and documents in the record, and culminating in the Motion to Assign, makes clear

---

13. In an affidavit, dated November 9, 1996, submitted by Debtor's accountant which accompanied the Debtor's response to the Motion to Convert, the accountant stated that Amelia Management, as well as the Debtor, paid Mr. Saleh's personal expenses because he did not want to open a personal bank account in his name for fear it would be subject to seizure by his creditors.

that Tenzer never intended to fulfill its obligations to the Debtor. The defining act evidencing Tenzer's intentions was the filing of the Motion to Assign, which was nothing more than a scheme devised by Tenzer to keep Mr. Saleh in control of the Debtor so that he could control the Debtor's most valuable asset, the leasehold interest, and maintain his control over the resolution of the AFC claim. The fact that Tenzer was able to immediately file the Motion to Assign after the Motion to Extend was denied, indicates whose interests were the focus of Tenzer's attention. Thus, Tenzer was not disinterested and represented an interest adverse to the estate from the outset and its initial retention was erroneous.

■ Alternatively, the Court concludes that even if Tenzer was qualified to be retained as Debtor's counsel at the beginning of the case, it lost that status when it took the actions that resulted in the preparation and filing of the Motion to Assign. The evidence establishes that Tenzer was not disinterested and acted in the interest of Mr. Saleh rather than the interest of the estate, insofar as its attorneys: 1) filed a motion to assume and assign the lease to the debtor's principal at a price of $100,000, despite having represented four days earlier that it was worth $500,000 – $750,000 or more; 2) proposed the assignment to the principal without considering his ability to pay or otherwise perform; 3) included in the motion to assume and assign numerous provisions highly favorably to the principal, including a break-up fee which, under the circumstances of this case, was entirely unwarranted; 4) attempted to circumvent a court order mandating the good faith filing of a motion to assume and assign the lease by January 31, 1997; 5) failed to inform the Court of the proposal to assign the lease to the principal, despite at least two opportunities when counsel was before the Court; [14] and 6) attempted to stave off the appointment of a trustee solely to keep the Debtor's principal in control. Not only were these actions performed in the interest of Mr. Saleh, but they also put at risk the results of Tenzer's previous actions which benefitted the estate.

Tenzer's behavior was characterized by an utter disregard of established norms of professional conduct requiring the avoidance of conflicts. Given Tenzer's lack of disinterestedness and its representation of an interest adverse to the estate, the Court shall consider whether it is appropriate to deny counsel's fees in part or in their entirety.

### *The Court's authority concerning compensation and reimbursement of expense awards*

■ Section 330(a)(1) provides that the court may award to a professional person employed under § 327 reasonable compensation and reimbursement for actual, necessary services. Similarly, § 330(a)(4)(A) provides that the court shall not allow compensation for services not reasonably likely to benefit the debtor's estate or necessary to the administration of the case. The fee applicant bears the burden of proving the reasonableness of compensation. *See In re JLM, Inc.,* 210 B.R. 19, 24 (2d Cir. BAP 1997); *In re*

---

14. Mr. Glass's assertion that he first thought of assigning the lease to Mr. Saleh immediately after the January 27th hearing where the Court denied the Motion to Extend is not credible. Rather, it appears that Mr. Glass had been contemplating a bid by Mr. Saleh as an alternative strategy if the Court denied the Motion to Extend. Mr. Glass knew that Mr. Saleh was interested in the lease and knew what price would be acceptable to him. He also knew at what amount to set the break-up fee. It would have been impossible for Mr. Glass to have the Motion to Assign prepared in four days if he had not had this arrangement in mind prior to the hearing. Further, even if Mr. Glass's representation is accurate, the Tenzer associate who appeared at the January 28, 1998 conference, held three days before the deadline to assign the lease, failed to advise the Court of the plan at that conference. This was the same associate who, according to Mr. Glass, had been informed the previous day of the plan to assign the lease to Mr. Saleh and whose time records reveal that she was actively engaged in preparing the motion papers prior to her appearance at that conference. This failure to inform the Court shows that the attorneys recognized the assignment to Mr. Saleh, especially at a bargain price, would raise serious questions with the Court. Thus, the Court concludes that Tenzer deliberately sought to gain some tactical advantage for Mr. Saleh by failing to disclose its intentions until the last possible moment.

*Keene*, 205 B.R. 690, 695 (Bankr.S.D.N.Y. 1997).

There is considerable debate about how benefit to the estate should be measured. Numerous courts have held that work done by attorneys must have actually benefitted the estate in order to be compensable. *See In re Ryan*, 82 B.R. 929, 931–32 (N.D.Ill. 1987) ("[A]ttorneys may recover fees from the estate only if their labors actually benefitted the estate."); *In re Allied Computer Repair, Inc.*, 202 B.R. 877, 886 (Bankr. W.D.Ky.1996) (finding that unless the services performed produce a demonstrable benefit to the bankruptcy estate, the court is not authorized to award compensation.).

 However, other courts subscribe to the view that counsel fees should be awarded for services which are reasonably likely to benefit the debtor's estate. *See In re Ames Dep't Stores, Inc.*, 76 F.3d 66, 71–72 (2d Cir.1996). The fact that debtor's counsel's services are unsuccessful is not a per se reason for denying compensation, although that fact may be taken into consideration in ascertaining the value of legal services to the estate. *See In re Greene*, 138 B.R. 403, 408 (Bankr.S.D.N.Y.1992); *Spanjer I*, 191 B.R. at 752, 757. The test is objective, focusing upon what services a reasonable lawyer or legal firm would have performed in the same circumstances. *See Id.; Keene*, 205 B.R. at 696; *JLM*, 210 B.R. at 25; *In re Taxman Clothing Co.*, 49 F.3d 310, 315 (7th Cir.1995); *Spanjer I*, 191 B.R. at 757–58. "[I]f the services of a debtor's attorney 'are reasonably likely to benefit the debtor's estate, they should be compensable.' " *Ames*, 76 F.3d at 72 (citation omitted). This standard does not rely on perfect hindsight, which the court must scrupulously avoid in making fee awards. *See Rancourt*, 207 B.R. at 341; *In re Automobile Warranty Corp.*, 138 B.R. 72, 81 (Bankr.D.Colo.1991).

 An attorney should only proceed with a legal service if the potential benefit of the service, which takes into consideration the chances of success, outweighs the costs.[15] *See In re Hunt*, 124 B.R. 263, 267 (Bankr. S.D.Ohio 1990); *Taxman*, 49 F.3d at 315–16. Moreover, the bankruptcy court may deny a professional's fees on account of serious breaches of fiduciary obligations. *See In re Wilde Horse*, 136 B.R. 830, 844 (Bankr. C.D.Cal.1991). One such obligation is the duty to counsel the debtor-in-possession to comply with its duties and obligations under the law. *See JLM*, 210 B.R. at 26; *Wilde Horse*, 136 B.R. at 840. To receive an award of attorneys fees under Bankruptcy Code § 330, "it is not enough for an attorney to work ethically and zealously for a client whose interest may be antithetical to the estate's [interest]." *Keene*, 205 B.R. at 696 n. 7.

 The bankruptcy court plays a significant role in protecting the assets of the bankruptcy estate in order that they be maximized for the benefit of creditors. The court bears responsibility for seeing that attorneys do not overreach in their attempt to be paid fees from the estate. *See Allied Computer Repair*, 202 B.R. at 880–81, 886 ("Simply put, billable hours do not necessarily translate into compensable hours.").

 While § 330(a)(4) gives the court authority to disallow fees and expenses to a professional when the services performed were not reasonably calculated to benefit the estate, § 328(c) gives the court discretion to disallow fees and expenses in instances when a professional becomes disinterested. *See Gray v. English*, 30 F.3d 1319, 1324 (10th Cir.1994). In such case, the court may even disallow fees and expenses incurred in performing services that are reasonably calculated to benefit the estate, in order to serve the deterrence purpose of § 328(c). *See Id.*

 Section 328(c) of the Code reinforces § 327(a) in allowing the court to deny compensation to a professional employed under § 327(a) who, at any time during the

---

**15.** "The [Bankruptcy] Court does not expect the attorney to succeed in every endeavor he undertakes on behalf of the client. But the endeavor for which the estate is expected to pay must be reasonably calculated to produce a benefit to the estate. This means that if the odds against success are greatly unfavorable, the benefit which would result if the endeavor succeeds should be of a greater value than an activity for which the chances of success appear greater." *Hunt*, 124 B.R. at 267.

course of his employment, fails to meet one of the two prongs required to satisfy § 327(a). *See Id.; See also In re Office Prods. of America, Inc.,* 136 B.R. 983, 986 (Bankr.W.D.Tex., 1992) (finding that even if counsel for debtor-in-possession begins as a disinterested person, compensation may be denied if, at any time during its employment by the debtor, counsel ceased to be disinterested or came to represent an interest adverse to the estate). Further, § 328(c) is applicable in instances where fees are sought by professionals when it is subsequently determined that their initial retention was erroneous. *Crivello,* 134 F.3d at 837.

■ The Court is given broad discretion to assess the facts and decide whether to deny all or part of the fee request. *Crivello,* 134 F.3d at 839. "If [the bankruptcy judge] perceives a materially adverse interest, he has at his disposal an armamentarium of permissible remedies, including (but by no means limited to) disqualification, disallowance of all or some fees, and invalidation of the security interest." *Martin,* 817 F.2d at 182–83. This discretion extends to services performed before and after the point at which counsel became disinterested. *Gray,* 30 F.3d at 1324 (recognizing the court's discretion concerning the award of fees); *See also Spanjer I,* 191 B.R. at 753 (citing *Tinley Plaza,* 142 B.R. at 279) (finding that "the court has discretionary authority to deny compensation for any part of an attorney's services performed outside the conflict.")

■ However, the Bankruptcy Code provision declaring that the bankruptcy court may deny compensation when a professional employed by the bankruptcy estate ceases to be disinterested does not require the denial of legal fees or disgorgement of previously paid fees in all cases. *See Gray,* 30 F.3d at 1323–24.

■ Several courts have suggested that the bankruptcy court should weigh the equities in deciding whether to deny fees where counsel fails to remain disinterested. *See Crivello,* 134 F.3d at 838. In the exercise of its discretionary authority to deny fees, the court may consider such factors as whether counsel's services provided any benefit to the

estate. *See Id.* Blanket reductions in fees may help strike a balance between the need for cost-conscious administration and the need to compensate bankruptcy attorneys on a level commensurate with attorneys in other areas of legal practice. *See Allied Computer Repair,* 202 B.R. at 884–85.

Thus, although the Court is given the discretion under § 328(c) to deny requests for compensation for services that are actually beneficial to the estate or reasonably calculated to benefit the estate, the Court may, for equitable reasons, determine that such amounts should be awarded. However, the court in *Gray* noted that, although the bankruptcy court has discretion, to allow certain fees pursuant to § 328(c), it should lean strongly toward the denial of fees when a professional employed by the bankruptcy estate ceases to be disinterested, and, if the past benefit to the wrongdoer fiduciary can be quantified, the court should require the disgorgement of compensation previously paid to the fiduciary even before conflict arose. *Gray,* 30 F.3d at 1324. *See also Wilde Horse,* 136 B.R. at 847–48 (denying compensation to attorney for the chapter 11 debtor denied any compensation and requiring it to disgorge retainer due to breach of fiduciary duty to act in the best interest of the estate and failure to act competently).

Thus, where counsel fails to meet the requirements of § 327, at the outset or throughout the pendency, of the case, the court has wide discretion in deciding fee awards.

■ This Court does not follow the per se rule that requires all fees be automatically denied for services performed in the period after the conflict existed. *See Spanjer I,* 191 B.R. at 753 (citing *Tinley Plaza,* 142 B.R. at 279) (finding that "[i]f the [bankruptcy] court determines that an attorney does not meet the requirements of § 327(a) ... then the court must deny compensation for the period that the conflict existed.") Rather, this Court follows the view that the bankruptcy court is given broad discretion to assess the facts of the particular case before determining whether to deny all or part of the requested fees for periods before and after an

attorney fails to satisfy the requirements of § 327(a).

### Application of law concerning award of compensation and reimbursement of expense to facts of this case

■ The Court has found that from the inception of this case, Tenzer was not disinterested and that it represented an interest adverse to the estate and, therefore, its retention was inappropriate. Consequently, in an exercise of its broad discretion, pursuant to § 328(c), the Court disallows all of the fees and expenses sought by Tenzer. Because of Tenzer's egregious conduct, as discussed below, and to serve the deterrence purpose of § 328(c), this disallowance includes those amounts sought by Tenzer for services performed that were reasonably likely to benefit the estate.

The same total disallowance of fees and expenses results under the Court's alternative finding that Tenzer ceased to be disinterestedness and represented an interest adverse to the estate [16] when it filed the Motion to Assign. Under this scenario, Tenzer failed to establish that any services it performed after filing the Motion to Assign was reasonably likely to benefit the Debtor's estate. Those actions which rendered Tenzer not disinterested also provided no conceivable benefit to the estate and, therefore, should not be compensated from estate assets. The evidence establishes that Tenzer, through the filing of the Motion to Assign, intentionally tried to place Mr. Saleh in total control of the sale of the lease to the detriment of the Debtor. If a hearing had gone forward as proposed by Tenzer and there were no competitive bidding, Mr. Saleh would have received the lease at a bargain price. If there were competitive bidding at the hearing, Mr. Saleh, in his capacity as principal of the Debtor, could have rejected any offer, thereby maintaining his control of the Debtor and his leverage in protecting his individual interests. Further, Mr. Glass's testimony that he was not aware that anyone had made a determination of whether Mr. Saleh was financially able to satisfy his obligations regarding the proposed purchase is additional evidence of Tenzer's failure to protect the interests of the Debtor while protecting those of Mr. Saleh. The Motion to Assign was nothing more than a transparent ploy to keep the principal in control at any cost. It is simply incongruous with the Court's role in protecting the assets of the bankruptcy estate to award counsel, from estate assets, for services that were not reasonably calculated to benefit the estate. Thus, those services Tenzer performed after it filed the Motion to Assign that were not reasonably calculated to benefit the estate could be appropriately disallowed under either § 330(a)(4) or § 328(c).

Although the Court finds that throughout this case Tenzer's actions were intended to benefit Mr. Saleh, it recognizes that certain services provided by Tenzer at the early stages of this case conferred a benefit to the estate. Tenzer's filing of the chapter 11 petition certainly benefitted the estate in that the lease could not have been marketed otherwise. Having reviewed the entire application, the Court finds that, but for the issue regarding the qualification of Tenzer under § 327(a), the Court would have awarded compensation and reimbursement of fees to Tenzer for the services rendered prior to the Motion to Assign. Pursuant to § 330, such services would have been compensable, at the reduced amount sought under the settlement agreement, in that at the time of their performance, the services were reasonably likely to benefit the estate.

However, although Tenzer's postpetition services up to the filing of the Motion to Assign, generally benefitted the estate, Tenzer put at risk the benefit of those services when it filed the Motion to Assign. The Motion to Assign, among other things, artificially lowered the initial bid thereby putting in jeopardy the benefits of a competitive bidding process. The filing of the Motion to Assign was merely an effort by Tenzer, in behalf of Mr. Saleh, to avoid the consequences of its agreement under the Consent Order. Tenzer conceived this scheme, concealed its true motivation, and intended its

---

16. Hereinafter, reference to the Court's finding of Tenzer losing its disinterestedness incorporates the Court's finding that Tenzer represented an interest adverse to the estate.

implementation through the filing of the motion. The beneficial actions that were placed in jeopardy include the ability to assume and assign the lease and the concomitant retention of Lansco, which worked diligently to maximize the value of the lease. Thus, when Tenzer filed the Motion to Assign, it intentionally acted contrary to the interests of the Debtor.

At the commencement of this case, James D. Glass and an associate each filed an affidavit in support of the Debtor's application to retain Tenzer as counsel. In those affidavits, both attorneys recognized Tenzer's obligation to disclose information related to Tenzer's representation of Mr. Saleh. In approving the stipulation regarding Tenzer's retention, this Court recognized the economic reasons favoring such dual representation. However, the Court was also aware of the difficulties inherent in a situation where the principal of the Debtor and the Debtor are represented by the same counsel. Nevertheless, the Court approved the retention based on its belief that an experienced bankruptcy counsel would take appropriate action to ensure the interests of the Debtor were protected if an issue were to arise in which the interests of the Debtor and the principal diverged. However, despite the obvious divergence of interests in this case, Tenzer chose to take actions that placed the Debtor's interests in peril in an effort to protect the interests of the principal. Such conduct is unacceptable from any attorney—but from attorneys who are well versed and experienced in bankruptcy matters, such conduct damages the very core of the system and its credibility.

Therefore, the Court finds that Tenzer's conduct was so egregious that Tenzer should not be rewarded for any of the services it performed. Moreover, where counsel has failed to remain disinterested, especially under the circumstances where it devised and implemented the scheme that promoted the interests of the principal over the interests of the debtor, denial of counsel's fees in their entirety is an appropriate response to preserve the integrity of the bankruptcy process and deter such behavior in the future. Therefore, the Court denies all the compensation for services and reimbursement of expenses sought by Tenzer.

## CONCLUSION

For the foregoing reasons, pursuant to § 328(c), the Court denies Tenzer's request for compensation and reimbursement of expenses as counsel to the Debtor and debtor-in-possession. Further, Tenzer is directed to disgorge the $22,000 retainer it received. Inasmuch as the funds were paid to Tenzer by a third party thereby raising issues under § 329, Tenzer is directed to pay $22,000 to the Trustee to be held by him in an escrow account until further order of this Court.

The Chapter 11 Trustee is to settle an order consistent with this Memorandum of Decision on five (5) days' notice.