Bernard P. ROME, Appellant,

v.

Joseph BRAUNSTEIN, etc., Appellee.

No. 93–1971.

United States Court of Appeals,
First Circuit.

Heard Jan. 4, 1994.

Decided March 22, 1994.

Bernard P. Rome, with whom Rome, George & Klein, Boston, MA, was on brief for appellant.

Isaac H. Peres, with whom Riemer & Braunstein, Boston, MA, was on brief for appellee.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and CYR, Circuit Judge.

CYR, Circuit Judge.

Bernard P. Rome, Esquire, appeals from a district court order entered on intermediate appeal, affirming a bankruptcy court ruling under Bankruptcy Code § 328(c) disallowing Rome's application for fees as court-appointed counsel to chapter 7 debtor Chestnut Hill Mortgage Corporation (CHM) due to disqualifying conflicts of interest. Finding no error, we affirm.

## I

## BACKGROUND

As its longtime corporate clerk and counsel, Rome filed a chapter 11 petition in behalf of CHM in November 1989, followed by an application for Rome's appointment as counsel to the chapter 11 debtor in possession pursuant to Bankruptcy Code § 1107(a), 11 U.S.C. § 1107(a); *see also id.* § 327(a), 11 U.S.C. § 327(a). Thereafter, as counsel to the debtor in possession, Rome filed three abortive chapter 11 reorganization plans proposing a 20% dividend to general creditors. Various CHM creditors successfully resisted

these initiatives, however, on the ground that the plans would unfairly advantage certain CHM insiders—including its president and sole shareholder, Arnold Leavitt, and Leavitt's family and friends—by providing priority repayment of their prepetition "loans" to CHM. In August 1990, after all three plans failed to win creditor approval, the bankruptcy court acceded to creditor demands for the appointment of a chapter 11 trustee, appellee Joseph Braunstein, and to Braunstein's retention of Riemer and Braunstein (R & B) as counsel to the chapter 11 trustee.

Meanwhile, three months before Braunstein's appointment as the CHM chapter 11 trustee, an involuntary chapter 7 petition had been filed against Arnold Leavitt. Shortly thereafter, while still serving as counsel to CHM in its chapter 11 case, and with bankruptcy court authorization, Rome began to serve as counsel to Arnold Leavitt in the involuntary chapter 7 proceeding. As chapter 11 trustee, appellee Braunstein began negotiations with Rome, by then also representing one Sandra Dickerman, Arnold Leavitt's secretary at CHM, in her ultimately successful bid to purchase property belonging to the CHM chapter 11 estate. In March 1991, less than two months after the bankruptcy court approved the Dickerman acquisitions from CHM, the CHM chapter 11 proceedings were converted to chapter 7 and Braunstein was appointed the CHM chapter 7 trustee.

Late in 1991, Braunstein, R & B, and Rome filed applications for compensation and reimbursement of expenses. The Braunstein application, as chapter 11 and chapter 7 trustee, and the R & D application as counsel to the chapter 11 and chapter 7 trustee, approximated $81,000 in fees. The Rome request, as counsel to CHM *qua* debtor and chapter 11 debtor in possession, approximated $62,000. The applications were opposed by CHM creditors; additionally, Braunstein, as the CHM chapter 7 trustee, opposed the Rome application.

At the hearing held on these fee applications, Braunstein represented to the bankruptcy court that he intended to set aside certain prepetition transfers of CHM assets as either preferential or fraudulent. Creditors represented to the court that Arnold Leavitt had "looted" CHM prior to Rome's filing of the CHM chapter 11 petition, by transferring CHM assets to Leavitt family members, and that Rome, in an effort to further Leavitt's interests at the expense of CHM and its creditors, repeatedly "obstructed" creditor efforts to investigate CHM's financial condition and to promote its reorganization. The bankruptcy court ultimately allowed the Braunstein and R & B fee applications in full. On the other hand, the court disallowed the Rome application entirely, on two grounds: (1) Rome's contentious tenure as counsel to the debtor in possession "produced virtually no benefit to creditors and loan participants"; and (2) Rome's concurrent representation of CHM and Leavitt, as well as CHM and Dickerman, was "patently inappropriate." The district court affirmed 158 B.R. 547.

## II

### *DISCUSSION*

The Bankruptcy Code imposes particularly rigorous conflict-of-interest restraints upon the employment of professional persons in a bankruptcy case.

> Except as otherwise provided in this section, the trustee, *with the court's approval,* may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or *represent* an *interest adverse* to the estate, *and* that are *disinterested persons,* to represent or assist the trustee in carrying out the trustee's duties under this title.

Bankruptcy Code § 327(a), 11 U.S.C. § 327(a) (emphasis added). *See* Fed. R.Bankr.P. 2014; *In re Cropper Co.,* 35 B.R. 625, 629–30 (Bankr.M.D.Ga.1983) (noting "strict standards" unique to bankruptcy); *see also* Bankruptcy Code § 1107(a), 11 U.S.C. § 1107(a) (§ 327(a) applicable to counsel representing debtor in possession); *In re Roberts,* 46 B.R. 815, 822 (Bankr.D.Utah 1985). Moreover, as the bankruptcy court is invested with ample power to deter inappropriate influences upon the undivided loyalty of court-appointed professionals *throughout their tenure,* the need for professional self-

scrutiny and avoidance of conflicts of interest does not end upon appointment. The court "*may* deny allowance of compensation ... if, *at any time* during such ... employment ..., such professional person is not a disinterested person, or *represents* or holds an *interest adverse* to the interest of the estate...." Bankruptcy Code § 328(c), 11 U.S.C. § 328(c) (emphasis added). Thus, section 328(c) authorizes a "penalty" for failing to avoid a disqualifying conflict of interest. *See* S.Rep. No. 989, 95th Cong., 2d Sess. 39 (1978) U.S.Code Cong. & Admin.News 1978, pp. 5787, 5825.

Although the Code idiom "interest adverse" is not defined,[1] the companion requirement—that appointees be "disinterested"—is defined, *see* Bankruptcy Code § 101(14), 11 U.S.C. § 101(14), as including, *inter alia*, one who is "not a creditor, an equity shareholder, or an insider," *nor* presently, or "within two years before [bankruptcy], a[n] ... *officer* ... of the debtor," *and* does not have "an *interest materially adverse* to the interest of the estate or of any class of creditors or equity security holders" for "any reason." *Id.* (emphasis added); *see In re Martin*, 817 F.2d 175, 179 (1st Cir. 1987). These statutory requirements—disinterestedness and no interest adverse to the estate—serve the important policy of ensuring that all professionals appointed pursuant to section 327(a) tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities.[2]

▮▮▮ In the exercise of its own ongoing affirmative responsibility to "root out impermissible conflicts of interest" under Bankruptcy Code §§ 327(a) and 328(c), the bankruptcy court must determine whether any competing interest of a court-appointed pro-

fessional "created either a meaningful incentive to act contrary to the best interests of the estate and its sundry creditors—an incentive sufficient to place those parties at *more than acceptable risk*—or the *reasonable perception* of one." *Martin*, 817 F.2d at 180 (emphasis added). The test is neither subjective, nor significantly influenced by the court-appointed professional's "protestations of good faith," as Rome would have it, *see, e.g., supra* note 2, but contemplates an objective screening for even the "appearance of impropriety." *Id.* at 180–81, 182. Finally, if its fact-specific inquiry leads the bankruptcy court to conclude that an impermissible conflict of interest looms or exists, available sanctions include disqualification and the denial or disgorgement of all fees. *Id.* at 182–83. *See* Bankruptcy Code § 328(c), 11 U.S.C. § 328(c). We, like the district court, will then review the bankruptcy court's factual findings for clear error and its conclusions of law *de novo*. *In re LaRoche*, 969 F.2d 1299, 1301 (1st Cir.1992).

The bankruptcy court determined that Rome improperly represented two undisclosed "interest[s] adverse" to the CHM chapter 11 estate—Arnold Leavitt and Sandra Dickerman—resulting in actual conflicts of interest warranting Rome's *retroactive* disqualification and forfeiture of all compensation from the chapter 11 estate. Rome raises three principal challenges to the bankruptcy court ruling.

### A. *The Duty of Disclosure*

▮▮▮ First, Rome argues that retroactive disqualification is inequitable in these circumstances, since the bankruptcy court and the trustee tacitly endorsed his representation of Leavitt and Dickerman, *pendente lite*, or, at

---

1. However, an "adverse interest" has been described in pragmatic terms as the "possess[ion] or assert[ion] [of] mutually exclusive claims to the same economic interest, thus creating either an actual or potential dispute between rival claimants as to which ... of them the disputed right or title to the interest in question attaches under valid and applicable law; or (2) [the possession of] a predisposition or interest under circumstances that render such a bias in favor of or against one of the entities." *In re Roberts*, 46 B.R. at 826–27.

2. Rome argues on appeal that he not only disclosed his position as the clerk of CHM but could reasonably have believed that such a ministerial position would not make him a corporate "insider" within the meaning of Bankruptcy Code § 101(31), 11 U.S.C. § 101(31). We express no view on these claims, and confine our holding to Rome's impermissible representation of two other clients (Leavitt and Dickerman) with "interests adverse" to the CHM estate which he was responsible for representing by court appointment.

the very least, voiced no objection until the filing of his application for compensation in December 1991. Given the relevant findings in this case, however, we are not swayed by Rome's resort to general notions of equity.

Although the bankruptcy court has an affirmative duty to exercise vigilance in avoiding impermissible conflicts of interest on the part of court-appointed professionals, *see, e.g., In re Anver Corp.,* 44 B.R. 615, 617 (Bankr.D.Mass.1984) (once alerted to potential conflict of interest on part of appointed counsel, the bankruptcy court must raise the issue, *sua sponte,* in order to safeguard its institutional integrity), normally the professional, especially counsel, possesses ready access to, if not full awareness of, the facts material to any existing or potential competing interest which might conflict with the interests court-appointed counsel must represent, or those which might generate an unacceptable appearance or risk of conflict.

■ As with other prophylactic ethical rules constraining attorney conduct, sections 327(a) and 328(c) cannot achieve their purpose unless court-appointed counsel police themselves in the first instance, especially in circumstances such as these, where the nominal applicant (CHM) for Rome's appointment is a corporate debtor in possession who can only act through its officers and agents— here Leavitt, Rome, and Dickerman—and *may not command the appointee's primary loyalty. See In re Roberts,* 46 B.R. at 837– 39, 846 (duty of disclosure and disallowance of compensation under §§ 327(a) and 328(c) are designed to "prevent 'the dishonest practitioner from [engaging in] fraudulent conduct, and to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties' ") (citation omitted). Thus, as soon as counsel acquires even constructive knowledge reasonably suggesting an actual or potential conflict, *see id.* at 839 (fiduciary duty of disclosure arises as soon as counsel becomes "aware" of facts), a bankruptcy court ruling should be obtained. *See, e.g., In re Martin,* 817 F.2d at 182 ("There must be *at a minimum* full and timely disclosure of the *details* of any given arrangement. Armed with *knowledge* of *all* the relevant facts, the bankruptcy court must determine, *case by case,* whether [a conflict exists].") (emphasis added); *see also In re Huddleston,* 120 B.R. 399, 400–01 (Bankr.E.D.Tex.1990) ("The case law is clear that the burden of disclosure is upon 'the person making the statement [of qualification for employment] to come forward with facts pertinent to eligibility and to make candid and complete disclosure.' ... '[T]his decision should not be left to counsel, whose judgment may be clouded by the benefits of the potential employment.' ") (citations omitted); *In re O'Connor,* 52 B.R. 892, 894 (Bankr.W.D.Okla. 1985) (counsel, who disputed existence of disqualifying conflict, requested court's "instructions on how [to] proceed").[3]

■ Absent the spontaneous, timely and complete disclosure required by section 327(a) and Fed.R.Bankr.P. 2014(a), court-appointed counsel proceed *at their own risk. See, e.g., In re Roger J. Au & Son, Inc.,* 71 B.R. 238, 242 (Bankr.N.D.Ohio 1986) (failure to disclose facts material to potential conflict may provide *totally independent* ground for denial of fees, quite apart from the actual representation of competing interests); *In re Thompson,* 54 B.R. 311, 317 (Bankr.N.D.Ohio 1985) (same); *In re Whitman,* 51 B.R. 502, 507 (Bankr.D.Mass.1985) (same); *In re Guy Apple Masonry Contractors, Inc.,* 45 B.R. 160, 163 (Bankr.D.Ariz.1984) (same); *see also In re Kendavis Indus. Int'l, Inc.,* 91 B.R. 742, 748–49 (Bankr.N.D.Tex.1988) (summarizing legislative history of §§ 327(a) and 330,

---

3. Of course, disclosure of facts suggesting a conflict is not invariably followed by disqualification. In special circumstances, for example, the bankruptcy court could determine, in the sound exercise of its discretion, that any potential impairment of its institutional integrity, or risk of divided loyalty by counsel, was substantially outweighed by the benefits to be derived from counsel's continued representation of multiple entities or the impracticability of disentangling multiple interests "without unreasonable delay and expense." *In re Hoffman,* 53 B.R. 564, 566 (Bankr. W.D.Ark.1985). *See In re O'Connor,* 52 B.R. at 895 (noting countervailing interest in "curtailment of administrative expenses" where potential for conflict is dormant or remote). In no event, however, may counsel *presume* dispensation from the full disclosure required by § 327(a) or the sanctions authorized under § 328(c). *See also* Fed.R.Bankr.P. 2014(a).

noting congressional concern that in earlier corporate reorganization proceedings "the financial well-being of investors and the public [had been] sacrificed to the [corporate] insiders' desire for protection and for profit"). Thus, Rome's failure to make full and spontaneous disclosure of the financial transactions among CHM, Leavitt, and Leavitt's family members shortly before Rome filed the CHM chapter 11 petition, *see infra* note 5 (and accompanying text); *see also* Fed.R.Bankr.P. 2014(a), and to obtain explicit court authorization to represent Dickerman, provided sufficient ground for the discretionary denial of compensation under section 328(c).

## B. The Risk Posed by Competing Interests

Second, in a bid to vindicate his failure to disclose, Rome claims there was no potential conflict of interest since Leavitt's and Dickerman's interests were never "adverse" to those of the chapter 11 estate.

### 1. The Leavitt Interests

■ Rome argues that section 327(a) does not absolutely prohibit concurrent representation of a corporate debtor in possession and its sole shareholder, absent evidence affirmatively demonstrating an "actual"—as distinguished from a "potential"—conflict of interest. Moreover, there could have been no "actual" conflict, he suggests, because: (1) between December 1989 and May 1990, Rome did not represent Leavitt; (2) between May 1990, when the involuntary chapter 7 petition was filed against Leavitt, and August 1990, when Braunstein was appointed the CHM chapter 11 trustee, it was not Rome but the chapter 7 trustee who represented the Leavitt chapter 7 estate; and (3) none of the transfers from CHM to Leavitt prior to CHM's chapter 11 petition have yet been proven improper, preferential or fraudulent. These arguments are specious.

The fact that Rome did not represent Leavitt until May 1990 is immaterial, since section 328(c) expressly empowers the bankruptcy court to disallow compensation if court-appointed counsel, "at any time," is either not a "disinterested" person "or represents or holds an interest adverse to the interest of the estate with respect to the matter on which [counsel] is employed." Bankruptcy Code § 328(c), 11 U.S.C. § 328(c). Rome's post-May 1990 representation of chapter 7 debtor Leavitt, against whom the CHM chapter 11 estate—also represented by Rome—held claims for the avoidance of alleged preferential and fraudulent transfers, created a clear conflict of interest *without regard to whether the Leavitt chapter 7 estate itself was represented by a trustee in bankruptcy.* After all, Rome sought compensation for services rendered *to the CHM chapter 11 estate,* not to Leavitt, the chapter 7 debtor. *Cf. In re Hoffman,* 53 B.R. 564, 565 (Bankr.W.D.Ark.1985) (§ 327(a) is inapplicable to appointment or compensation of counsel to chapter 7 debtor). Yet Rome's representation of Leavitt in the involuntary chapter 7 proceeding plainly undermined confidence in Rome's ability to provide impartial advice to the CHM estate relating to the prospects for recovering the alleged prepetition transfers to Leavitt and Leavitt family members.

■ As concerns Rome's third contention—that no transfers from CHM to Leavitt prior to CHM's chapter 11 petition have yet been *proven* improper, preferential or fraudulent—we are bound by the bankruptcy court's factual findings unless clearly erroneous. *See In re LaRoche,* 969 F.2d at 1301; *In re Martin,* 817 F.2d at 182–83 (noting that "[t]he bankruptcy judge is on the front line, in the best position to gauge the ongoing interplay of [§ 327(a)] factors and to make the delicate judgment calls which such a decision entails"); *In re Huddleston,* 120 B.R. at 402–03 (favoring case-by-case analysis). And since section 327(a) is designed to limit even appearances of impropriety to the extent reasonably practicable, doubt as to whether a particular set of facts gives rise to a disqualifying conflict of interest normally should be resolved in favor of disqualification. *Cf. In re Freedom Solar Ctr., Inc.,* 776 F.2d 14, 17 (1st Cir.1985).[4]

---

4. Although *In re Freedom Solar* involved an application of the Maine Bar Rules in a bankruptcy proceeding, we cite to it throughout this opinion in contexts legitimately informed by its closely

Even if we were to set to one side Rome's unexplained failure at the outset to apprise the bankruptcy court of facts that *might* generate an appearance of impropriety, the bankruptcy court's section 328(c) ruling is well supported by the record. As the bankruptcy court was informed at the hearing on the fee applications, *see supra* at p. 57, CHM creditors had commissioned the Peterson Report, a pre-chapter 11 investigation into CHM's financial condition, which disclosed that Arnold Leavitt had caused large prepetition transfers from the CHM treasury to himself and immediate family members.[5] In addition, Rome had shown considerable intransigence to efforts by Peterson to obtain access to certain CHM records, even informing Peterson that access must await "litigation" and "discovery." *See In re Martin*, 817 F.2d at 182 (noting relevance of "adverse" interests which threaten "to hinder or to delay the effectuation of a [reorganization] plan"); *cf. In re Freedom Solar*, 776 F.2d at 16 (noting shareholder interest "in delaying the turnover of the assets [in order] to use his possession of them as a negotiating chip, while the debtor's interest was in cooperating with the trustee to achieve the swiftest resolution possible"); *In re Kendavis*, 91 B.R. at 750–51 (describing counsel's resort to dilatory "scorched earth" tactics in behalf of insiders "adverse" to debtor). Coupled with the preferential "insider" terms proposed in the three CHM chapter 11 reorganization plans Rome presented to CHM creditors, his continued participation promoted the readily foreseeable perception that he was attempting to insulate Leavitt's personal and family financial interests at the expense of the CHM chapter 11 estate and its creditors. *See id.* at 750 (internal corporate communication suggested that attorneys improperly represented family controlling debtor corporation, and not their client of record—the debtor); *In re Hoffman*, 53 B.R. at 565 (first loyalty of corporate debtor's counsel must lie with corporation, not with its individual officers).

### 2. *The Dickerman Interests*

Rome argues, in a similar vein, that after Braunstein's appointment as the CHM chapter 11 trustee in August 1990, Braunstein alone represented CHM's interests. Thus, *as a matter of law*, there could have been no disqualifying "conflict of interest" in Rome's concurrent representation of Dickerman in her successful purchase of CHM's assets. Moreover, even as a factual matter, he argues, there could have been no actual conflict because Dickerman was the *only* bidder and the sale benefited both buyer and seller.

As with other arguments insistently advanced by Rome, this one presupposes that there can be no disqualifying conflict absent proof of *actual loss or injury*. On the contrary, simultaneous representation of the buyer and the seller in the same transaction is a prototypical disqualifying conflict of interest even if it is not invariably disqualifying in all circumstances. *See In re Tidewater Memorial Hosp., Inc.*, 110 B.R. 221, 228–29 (Bankr.E.D.Va.1989) ("[D]ouble representation [in acquisition of debtor's assets] can be allowed, if at all, only under the strictest adherence to the statute and regulations," including full *disclosure*.). Even if Dickerman was the highest bidder for these CHM assets, or even the only one, Rome's longtime position as corporate clerk and counsel to CHM, both prepetition and postpetition, presumably afforded him unique access to inside information concerning the nature and value of its assets, information that Rome could have used (or been tempted to use) to enable his other client—Dickerman—to submit a better calibrated bid than arm's-length bidders could venture, thereby potentially chill-

analogous discussion. *See, e.g., In re Kendavis*, 91 B.R. at 752 ("The Bankruptcy Code provisions dealing with conflicts of interest find their counterparts in the ABA Code of Professional Responsibility."); *In re Roberts*, 46 B.R. at 829–37 (same).

5. Appellee Braunstein, the CHM chapter 7 trustee, represented to the bankruptcy court that he had objected to Leavitt's chapter 7 discharge, and was preparing to initiate an adversary proceeding against Leavitt's wife and son to recover an automobile allegedly transferred to Leavitt by CHM a few months before Rome filed the chapter 11 petition in behalf of CHM. *Cf. In re Freedom Solar*, 776 F.2d at 17 (potential adverse interest looms where shareholder of corporate debtor may have received preferential transfer).

ing bidding at the expense of CHM and its creditors. *Cf. In re Freedom Solar,* 776 F.2d at 16 (corporate debtor's shareholder had legitimate interest in buying assets at lowest possible price; debtor in selling at highest price). Furthermore, counsel to a chapter 11 *debtor* owes continuing loyalty to the *debtor* throughout the chapter 11 proceedings; appointment of a chapter 11 trustee does not end counsel's obligation to the *debtor entity. See id.* at 18 (noting that "[f]ederal law imposes enduring duties on the debtor ... [and] [i]n these situations, the debtor needs real representation and advice"; ethical rules are designed "to avoid the possibility that [the attorney] will succumb to temptation and give tainted advice"). In our considered view, therefore, Rome's unauthorized representation of Dickerman generated a palpable appearance and risk of divided loyalties, *see In re Thompson,* 54 B.R. at 316, placing the CHM estate at "more than acceptable risk," *In re Martin,* 817 F.2d at 180.

### C. *Severity of Sanction*

■ Finally, Rome argues, even if the bankruptcy court supportably determined that he represented "adverse" interests that should have been disclosed *ab initio,* the most it should have done is reduce his compensation since there is no evidence that any conflict of interest, however suspect in appearance, *actually* harmed the chapter 11 estate or its creditors, and the trustee concedes that Rome provided "valuable services" to the estate.[6]

■ An attorney retained pursuant to section 327(a) assumes a fiduciary responsibility to refrain from rendering any unauthorized service in furtherance of an interest adverse to the client he serves by court appointment. *See In re Kendavis,* 91 B.R. at 753 (citing *Wolf v. Weinstein,* 372 U.S. 633, 641, 83 S.Ct. 969, 975, 10 L.Ed.2d 33 (1963)). "A fiduciary ... may not perfect his claim to compensation by insisting that, although he had conflicting interests, he served his several masters equally well or that his primary loyalty was not weakened by the pull of his secondary one." *Woods v. City Nat'l Bank & Trust Co.,* 312 U.S. 262, 269, 61 S.Ct. 493, 497, 85 L.Ed. 820 (1941); *In re Roger J. Au,* 71 B.R. at 241. Especially where there has been a clear failure to make timely and spontaneous disclosure of all facts material to a disqualifying conflict of interest, counsel appointed pursuant to section 327(a) can lay no *claim of right to a lesser sanction* than the bankruptcy court is authorized to impose pursuant to section 328(c).

■ Like other courts which have considered the issue, however, we adopt no *per se* or brightline rule invariably *requiring* denial of all compensation under section 328(c).[7] Nevertheless, based on its familiarity with the CHM proceedings, the bankruptcy court in this case acted well within its discretion in finding that Rome's services "produced virtually no benefit." *See, e.g.,* Bankruptcy Code § 330(a)(1), 11 U.S.C. § 330(a)(1) (compensation may be based on assessment of "the value of such services"); *In re Kendavis,* 91 B.R. at 762 (reducing fees by 50% for conflict of interest, but citing "exceptional circumstances"); *In re Whitman,* 51 B.R. at 506 (noting that "results obtained" are relevant consideration). Furthermore, where court-appointed counsel has served under an undisclosed disqualifying conflict of interest, the bankruptcy court can-

---

6. We need not address Rome's argument that it was inequitable to allow the Braunstein and R & B fee applications in full, yet disallow Rome's application in full. Rome informed the bankruptcy court that he was "not opposed" to the Braunstein and R & B fee applications. Hence, the reasonableness of the former ruling is an issue which has been waived. *See Mark Bell Furniture Warehouse, Inc. v. D.M. Reid Assocs., Ltd. (In re Mark Bell Furniture Warehouse, Inc.),* 992 F.2d 7, 9 (1st Cir.1993).

7. *See, e.g., In re Kendavis,* 91 B.R. at 762 (general rule favors total denial of compensation, but equities may allow lesser sanction as facts war-

rant); *In re Roger J. Au,* 71 B.R. at 242–43 (since § 328(c) says "may deny," the bankruptcy court retains discretion to depart from general rule of total denial, where equities demand); *In re GHR Energy Corp.,* 60 B.R. 52, 68 (Bankr.S.D.Tex. 1985) (penalty for § 327(a) conflict may be adjusted to reflect gravity of breach); *In re Roberts,* 46 B.R. at 846–48, 850 (same, noting that bankruptcy court is court of equity). *But cf. In re Chou–Chen Chems., Inc.,* 31 B.R. 842, 850–51 (Bankr.W.D.Ky.1983) (favoring denial of all compensation if conflict exists, regardless of benefit from services rendered).

not always assess with precision the effect the conflict may have had either on the results achieved or the results that might have been achieved by following "the road not taken." *See Woods,* 312 U.S. at 269, 61 S.Ct. at 497 ("[T]he incidence of a particular conflict of interest can seldom be measured with any degree of certainty [and [t]he bankruptcy court need not speculate as to [ ] the result of the conflict...."); *In re Tidewater,* 110 B.R. at 229 (denying compensation even though there was "[n]o doubt the law firm performed valuable services in the chapter 11 case").[8] Yet as an appellate court, we are poorly positioned to second-guess a bankruptcy court's judgment call in these circumstances, and neither we nor the district court have been shown any reason for doing so in the present case.

*The district court judgment is affirmed.*

---

8. For example, the bankruptcy court observed that Rome's role as counsel to CHM, *qua* debtor in possession, generated vigorous opposition to all three reorganization plans, as well as unusually intense antagonism from CHM's general creditors (including Rome's longtime law partner). The clear implication, unverifiable in hindsight, is that CHM's reorganization prospects may have been better but for Rome's insistence on serving three clients simultaneously in these proceedings. *In re Kendavis,* 91 B.R. at 748 ("[E]thical violations or conflicts of interest may lessen the value of services. If an attorney holds an undisclosed adverse interest, a court is empowered to deny all compensation.") (citation omitted); *In re Whitman,* 51 B.R. at 507 (same). Retrospective damage assessments are made all the more difficult where counsel has labored under several simultaneous conflicts of interest.