In re MOLTEN METAL TECHNOLOGY, INC., MMT of Tennessee, Inc., MMT Federal Holdings, Inc., M4 Environmental Management, Inc., M4 Environmental L.P., Debtors.

Nos. 97–21385–CJK, to 97–21389–CJK.

United States Bankruptcy Court,
D. Massachusetts.

Feb. 11, 2003.

Joseph Bodoff, Esq., Roger Goldman, Esq., for Latham & Watkins.

Alan Braunstein, Esq., Chapter 11 Trustee.

D. Ross Martin, Esq., for MMT Recovery LLC.

Eric Bradford, Boston, MA, United States Trustee.

### MEMORANDUM OF DECISION ON APPLICATION OF LATHAM & WATKINS FOR FINAL COMPENSATION AND EXPENSE REIMBURSEMENT AS SPECIAL COUNSEL TO THE DEBTORS

CAROL J. KENNER, Bankruptcy Judge.

The law firm of Latham & Watkins ("L & W" or "the firm") has applied under 11 U.S.C. § 330 for final compensation and expense reimbursement for services it rendered and expenses it incurred as special counsel to the Debtors in these jointly administered cases. The United States Trustee and the Chapter 11 Trustee oppose the application on numerous grounds. One basis advanced by the Trustee is that the firm, in seeking approval of its employment as special counsel, failed to disclose a connection with parties in interest in the case, which connection had significant bearing on the firm's employment as special counsel. The connection in question was a "Confidentiality and Joint Defense Agreement" between the firm (as counsel to Debtor Molten Metal Technology, Inc. ("MMT")) and, among others, certain of the Debtors' officers and directors and their respective counsel. On the basis of the firm's nondisclosure of this connection, the Trustee asks that the Court deny further compensation and order the firm to disgorge all compensation paid it to date

(on its first interim application). For the reasons set forth below, the Court will sustain the Trustee's objection and hold that that nondisclosure of the joint defense agreement requires denial of all compensation in the case, including disgorgement of fees and expenses paid on an interim basis.

### Facts and Procedural History

Debtor Molten Metal Technology, Inc. ("MMT") was a publicly-held corporation in the business of developing and employing technologies for the processing, recycling, and disposal of radioactive and other hazardous wastes. The largest customer for MMT's nuclear services business was the United States Government.[1] Beginning in 1993, Latham & Watkins and attorney Roger S. Goldman, a member of the firm, represented the Debtor in matters having to do with governmental contracts.

In May, 1997, approximately seven months before the Debtors commenced these jointly-administered cases, MMT was being investigated by the Inspector General of the United States Department of Energy. By December 3, 1997, when the Debtors commenced these bankruptcy cases, MMT had become the subject of additional investigations by the Federal Elections Campaign Task Force, the United States Department of Justice (including a grand jury investigation), the Senate Committee on Governmental Affairs, and the Oversight and Investigation Subcommittee of the House Commerce Committee.[2] Latham & Watkins and attorney

Goldman represented the Debtor in conjunction with these investigations as well.

As the Trustee has outlined elsewhere in this case, the subject matter of the investigations included, among other things, (1) whether MMT improperly billed and booked revenue from its subsidiary, M4, for work performed for the federal government, in criminal violation of its cost-sharing contracts with the federal government, and (2) whether MMT acted improperly in receiving approximately $30 million in funding from the DOE.[3] The former issue, especially, is closely linked to the factual basis on which the Chapter 11 Trustee in this case later brought suit against several of MMT's officers and directors, including William M. Haney III, who, until mid-November, 1997, was president, CEO, chairman of the board of directors, and a substantial shareholder of MMT; after the bankruptcy filing, he was no longer president and CEO but remained a member of the board. The Trustee's allegations include detailed charges that Haney and others falsified MMT's accounting records and statements to the SEC by falsely listing receivables from its M4 subsidiary as income of MMT.[4] Among other things, the misstatements later induced investors to purchase $20 million in preferred shares of MMT.[5] The Trustee also alleged that, after the bankruptcy filing, Haney actively suppressed and prevented the disclosure of information (including the accounting falsification) to MMT's new CEO, the Bank-

---

1. Debtor's Application for Authority to Employ Special Government Contracts Counsel [Latham & Watkins], filed 1/13/98, at ¶ 5.

2. The dates on which the various investigations began are not clear.

3. See Trustee's Opposition to Defendant Haney's Motion for Protective Order, filed on 1/19/02 in Adversary Proceeding No. 99–1653, at p. 5; see also Trustee's Second Amended

Objections to Claims and Trustee's Counterclaims against Haney, Gatto, and seven others in Adversary Proceeding No. 99–1653, filed July 11, 2000, at ¶¶ 71, 186–190.

4. Trustee's Second Amended Objections to Claims and Trustee's Counterclaims in Adversary Proceeding No. 99–1653, filed July 11, 2000, esp. ¶¶ 100–106.

5. *Id.* at ¶ 105.

ruptcy Court, the Official Committee of Unsecured Creditors, and MMT's bankruptcy counsel, which information would have averted a further loss of more than $20 million after commencement of the bankruptcy case.[6]

On May 19, 1997, and in furtherance of its representation of the Debtor with respect to the investigations, the firm, by Goldman, entered into a Confidentiality and Joint Defense Agreement with MMT, MMT's co-counsel (Bingham, Dana & Gould LLP), three of MMT's officers and directors (William M. Haney III, Victor Gatto, and Gene Berman), and their respective counsel (the firms of Hale & Dorr LLP, Vinson & Elkins LLP, and Duncan & Allen). In the Agreement, the parties expressly recognized that "[e]ach of the Clients [MMT, Haney, Gatto, and Berman] has received a *subpoena duces tecum* in connection with the Investigation [by the Office of the Inspector General of the United States Department of Energy]." Agreement, § 1. They further stated that "[t]he Investigation may result in administrative or judicial proceedings against one or more of the Clients." *Id.* They concluded: "On the basis of currently available information, the Clients and their Counsel believe and anticipate that the nature of the Investigation and the relationships among the Clients will present various common legal and factual issues that warrant a joint defense effort." *Id.* To that end, the parties agreed to exchange with and disclose to each other various confidential defense materials while preserving and protecting, as against those who were not parties to the Agreement, the confidentiality of such materials and any applicable privilege or protection.

The Agreement placed restrictions on the use and confidentiality of shared defense materials. With respect to use, the Agreement states:

Subject to the restrictions of this Agreement, each Party agrees to use Defense Materials received from one or more other Parties solely in connection with the preparation of defenses in the Investigation and any other investigation, litigation, or proceeding arising from or relating to it. Such material shall not be used for any other purpose.

Agreement, § 3. With respect to confidentiality, the Agreement states:

The Parties will use their best efforts to ensure that the confidentiality of Defense Materials is maintained at all times, and that no disclosure is made that would result in a waiver or loss of any privilege or protection otherwise available.

*Id.* The Agreement permitted disclosure of the defense materials to only a very small universe of persons:

(a) employees of any Counsel who are assisting in the representation of Counsel's client; and (b) experts or consultants working on behalf of or under the direction of any Counsel.

*Id.* The parties agreed that obligations imposed by the Agreement with respect to use and confidentiality would continue in perpetuity notwithstanding the conclusion or resolution of the Investigation as to any Client or any Party's withdrawal from the Agreement. Agreement, ¶ 14.

MMT and four affiliates commenced these bankruptcy cases by filing voluntary petitions under Chapter 11 on December 3, 1997, and the Court shortly thereafter ordered that their five cases be administra-

---

**6.** *Id.,* Count XVI for Postpetition Breach of Fiduciary Duty against Haney and others, commencing at p. 72, esp. ¶ 105.

tively consolidated. On January 13, 1998, the Debtors applied for authority under 11 U.S.C. § 327(e) to employ Latham & Watkins as special counsel. In support of the application, the firm submitted the affidavit[7] of Roger Goldman as the verified statement required by FED. R. BANKR. P.2014(a). In the affidavit, Mr. Goldman stated that the firm's connections with the various parties in interest were "as set forth in the foregoing application." The application itself disclosed that the firm had represented the Debtors in conjunction with the ongoing federal investigations and on matters related to government contracts, and that the firm was the repository of the documents previously produced in these investigations, but it made no mention of the Confidentiality and Joint Defense Agreement.

After considering an objection interposed by the Official Committee of Unsecured Creditors, the Court allowed the application (as amended) and thereby authorized the Debtor to employ Goldman and the firm as special counsel for two purposes: (i) to address governmental contract matters and (ii) to represent the Debtors in conjunction with the investigations that were then being conducted by the United States Department of Justice, the United States Department of Energy Inspector General, and the congressional committees.

The Debtors remained debtors-in-possession until August 1998, when their post-petition lender moved for appointment of a chapter 11 trustee. On August 21, 1998, the Court allowed the motion and directed the United States Trustee to appoint a chapter 11 trustee. The United States Trustee appointed Stephen Gray to serve as chapter 11 trustee in these five cases,

and, on August 24, 1998, the Court allowed the United States Trustee's application to approve that appointment. Mr. Gray continues to serve as chapter 11 trustee in these cases.

The Chapter 11 Trustee (by separate special counsel) brought suit against certain of MMT's officers and directors, including the Messrs. Haney and Gatto who are parties to the Agreement, for damages for alleged wrongful acts: breach of fiduciary duty, breach of duty of loyalty, corporate waste, insider trading, and gross negligence. In conjunction with that suit, the Trustee requested and later (in December, 2000) subpoenaed documents in the possession of Latham & Watkins, including some that Mr. Haney had produced, subject to the requirements of the Confidentiality and Joint Defense Agreement. Citing its obligations under the Agreement, the firm refused to produce the documents. This was the first time that existence of the Agreement had been disclosed in the bankruptcy case; the Court had not earlier been informed that such an agreement existed. Haney, whose interest the firm was protecting by withholding the subpoenaed documents, moved for a protective order and for return to him of the documents at issue, arguing that the documents were privileged. Rejecting the privilege argument, the Court ordered the firm to turn over the documents to the Trustee, and the firm then complied.

The firm has now filed three applications for compensation in these cases. On April 30, 1998, it filed its First Application for Interim Compensation and Expense Reimbursement as Special Counsel to the Debtors, seeking compensation of

7. The affidavit was entitled "Signed Statement of Professional Person" and was attached as Exhibit A to the application.

$26,955.50 and expense reimbursement of $4,379.89. On June 2, 1998, the Court allowed this application in full on an interim basis, subject to final review at the completion of the cases.[8] On August 31, 1998, the Firm filed a Second Application, seeking further compensation of $3,946.00 and expense reimbursement of $737.77. On September 9, 1998, the Court ordered that, "in light of the appointment of a chapter 11 trustee and the debtors' financial condition, the court will defer consideration of the pending interim fee application until conclusion of these cases." Accordingly, no action has been taken on the Second Application. On February 15, 2002, the firm submitted an Application for Final Compensation and Expense Reimbursement, seeking, in addition to the amounts requested in its Second Application, further compensation of $13,739 and expense reimbursement of $821.86, with most of this amount being attributable to time expended in responding to the Trustee's request for production of documents.

The Chapter 11 Trustee and the United States Trustee have filed objections to the application. The Court held a hearing on the matter on January 6, 2003. Although the Trustee has submitted the Confidentiality and Joint Defense Agreement, none of the parties has requested an evidentiary hearing or otherwise sought to submit evidence.

## Discussion

■ The Final Application of Latham & Watkins requires that the Court review all the fees requested by Latham & Watkins in its First Interim, Second Interim, and Final Applications, even those that the Court has allowed on an interim basis.[9]

### 1. Nondisclosure of Confidentiality and Joint Defense Agreement

■ Latham & Watkins was employed as special counsel to the debtors in possession. Employment as special counsel is governed by § 327(e) of the Bankruptcy Code.[10] While this subsection does not require that special counsel be entirely "disinterested" (a requirement for persons employed under § 327(a)), it does require that such counsel "not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed."

---

**8.** The order stated: "These allowances are not final; they are subject to review at the completion of the cases. If it appears that any of these awards was excessive in light of the results achieved and the benefit received by the estates, the Court may order partial or complete disgorgement. All interim awards are subject to full or partial disgorgement if these cases become administratively insolvent." It is undisputed that these cases have become administratively insolvent.

**9.** *In re Taxman Clothing Co.*, 49 F.3d 310, 311 (7th Cir.1995) ("all interim awards of attorney's fees in bankruptcy cases are tentative"); *Matter of Evangeline Refining Co.*, 890 F.2d 1312, 1321 (5th Cir.1989) (interim fee awards are subject to final adjustments and, as such, are fully reviewable); *In re Stable Mews Assoc.*, 778 F.2d 121, 123 n. 3 (2d Cir.1985) ("Interim awards are, by definition, not final."); and *In re Callister*, 673 F.2d 305, 307 (10th Cir.1982) ("Interim awards ... are in no respect final adjudications on the question of compensation.").

**10.** Section 327(e) states:

The trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

11 U.S.C. § 327(e). In chapter 11, a debtor in possession enjoys the rights of a trustee serving in a case under chapter 11, including the trustee's right to employ special counsel under § 327(e). 11 U.S.C. § 1107(a).

*Id.* In order to subject potentially adverse interests to review *before* employment is approved, Bankruptcy Rule 2014(a) requires that the application to employ be accompanied by a verified statement of the person to be employed that discloses the connections between that person and the universe of parties in interest in the case.[11]

The professional cannot pick and choose which connections to disclose. See *In re Hot Tin Roof, Inc.,* 205 B.R. [1000] at 1003 [(1st Cir. BAP 1997)]. It is the responsibility of the professional to disclose all relevant connections. See *In re The Leslie Fay Cos., Inc.,* 175 B.R. 525, 533 (Bankr.S.D.N.Y.1994). Although an attorney need not disclose every past or remote connection with every party in interest, he must disclose those presently or recently existing, whether they are of business or personal in nature, which could reasonably have an effect on the attorney's judgment in the case. See *In re Rusty Jones, Inc.,* 134 B.R. 321, 346 (Bankr.N.D.Ill.1991).

*Kagan v. Stubbe (In re El San Juan Hotel Corp.),* 239 B.R. 635, at 647 (1st Cir.BAP 1999). Special counsel may be denied all compensation for services and reimbursement of expenses if, at any time during counsel's employment, counsel held "an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed." 11 U.S.C. § 328(c)[12]; *In re El San Juan*

*Hotel Corp.,* 239 B.R. at 647. Not all connections are necessarily disqualifying, but failure to disclose a relevant connection before employment is authorized can in itself justify a discretionary denial of fees under § 328(c). *Rome v. Braunstein,* 19 F.3d 54, 59 (1st Cir.1994). In *Rome,* where the Court of Appeals held that "[counsel's] failure to make full and spontaneous disclosure ... provided sufficient ground for the discretionary denial of compensation under section 328(c)," the Court of Appeals explained:

Absent the spontaneous, timely and complete disclosure required by section 327(a) and Fed.R.Bankr.P.2014(a), court-appointed counsel proceed at their own risk. See, *e.g., In re Roger J. Au & Son, Inc.,* 71 B.R. 238, 242 (Bankr. N.D.Ohio 1986) (failure to disclose facts material to potential conflict may provide *totally independent* ground for denial of fees, quite apart from the actual representation of competing interests) . . . .

*Rome v. Braunstein,* 19 F.3d at 59–60 (emphasis added).

In order to determine whether the firm's nondisclosure of the Confidentiality and Joint Defense Agreement should have any bearing on the allowance of the firm's application for compensation and reimbursement, the Court must ask two questions. First, was the Agreement a relevant connection, one that could reasonably

---

11. FED. R. BANKR. P.2014(a) states that an application for an order of employment "shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee."

12. Section 328(c) states:
    Except as provided in section 327(c), 327(e), or 1107(b) of this title, the court

may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 or 1103 of this title if, at any time during such professional person's employment under section 327 or 1103 of this title, such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.
    11 U.S.C. § 328(c).

have an effect on the attorney's judgment in representing the debtor in possession? And, if so, did the firm's obligations under the Agreement give the firm an "interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed"? [13]

For the following reasons, the Court concludes that the Agreement was not only relevant to the employment decision but, especially without disclosure, also a disqualifying adverse interest. The firm was being employed to represent the Debtor–in–Possession in conjunction with certain governmental investigations; among other things, the firm would function as the eyes and ears of the bankruptcy estate in the investigations. As the Agreement itself recited, the investigations "may result in administrative or judicial proceedings against one or more of the Clients," meaning against the Debtor *and* those of its officers and directors who were parties to the Agreement. And, as a corporation can act only through its agents, one can reasonably infer that, if the investigations did lead to judicial proceedings against the Debtor, it would be on the basis of acts committed by its agents, and especially the officers and directors who were the subjects of these investigations. Therefore, it is entirely likely that, in the course of its work as MMT's counsel, both before the commencement of these cases and after, the firm would have come into possession of evidence on the basis of which the Debtor in possession, as a fiduciary of the bankruptcy estate, would want to, and even be obligated to, bring suit or at least investigate possible causes of action against its own officers and directors.[14] Special counsel, in the discharge of their fiduciary duties to the estate, would then be obligated to bring such information to the attention of (at least) the Debtors in possession and their general counsel in the bankruptcy case.

But Latham & Watkins, as a party to the Agreement, was contractually bound *not to disclose* such materials; instead, it was contractually bound to do its best to ensure that their confidentiality be maintained and to refrain from using such material for any but defensive purposes. In short, the Agreement contractually precluded the firm from discharging certain obligations to the bankruptcy estate that, in the course of its investigation, might well have arisen. And, even if, in the final analysis, the Agreement were deemed not quite so preclusive, the fact that the other parties to the Agreement could have argued otherwise (as Mr. Haney actually did in this case) might be enough to cause Latham & Watkins to pull its punches. At the very least, the Agreement was an ob-

---

13. I do not mean to suggest that compensation should be affected only if both are answered in the affirmative; rather, the latter question helps determine the extent to which the connection, and its nondisclosure, should affect the firm's compensation.

14. This is not just speculation or "horrible imaginings alone." See *In re Martin*, 817 F.2d 175, 183 (1st Cir.1987) (grant of mortgage to law firm as security for its fee was not impermissible per se but only if it rendered the lawyer's interest materially adverse to the estate; "the potential for conflict and the appearance of conflict, without more, can justify cancellation of such a security interest. Yet, horrible imaginings alone cannot be allowed to carry the day."). The Trustee has uncovered ample cause in this case to seek redress for prepetition malfeasance by MMT's officers and directors, including Haney and Gatto. See the Trustee's Second Amended Objections to Claims and Trustee's Counterclaims against Haney, Gatto, and seven others in adversary proceeding, No. 99–1653, now settled. The Debtors' officer and director liability insurers have now paid out approximately $20 million in settlement of the Trustee's claims and other's like it (asserted by stockholders against the officers and directors).

stacle that other parties to the Agreement could interpose as a hurdle to be surmounted before disclosure of the material could be accomplished. Also, the Agreement might reasonably be viewed as evidence that the firm was bound by a strategic decision on the part of MMT, or by some who at one time controlled it but (after the bankruptcy filing) might no longer,[15] that in the subject matters of the various investigations, MMT would not attempt to hold the officers and directors liable for any damages and liability their misdeeds might have visited on the Debtor, its creditors, and its stockholders. Without question, all of this could reasonably have had an effect on the firm's judgment and conduct in the case.

Moreover, the Agreement clearly did have an effect on what the estate, or those having an interest in it, could expect the firm to do in the case. In essence, the Agreement created a blind spot: the firm could not report on at least some of what it saw and knew. This compromised the firm's value to the bankruptcy estate and hamstrung its ability to carry out the duties for which it was being employed in the Chapter 11 case.

Worse still, nowhere in the record did the firm ever disclose that it was under this impediment. The result was that the estate was handicapped by a blind spot of the most dangerous sort: one of which it was unaware. A bankruptcy fiduciary can perhaps compensate for a blind spot, but not if he or she is unaware that it even exists.[16]

For all these reasons, I conclude that the Agreement was highly relevant to Latham & Watkins' employment as special counsel to the Debtor–in–Possession and therefore that the firm was bound to disclose it in its Rule 2014(a) verified statement. The Agreement was a "connection" (within the meaning of Rule 2014(a)) to Haney, Gatto, and Berman, who were "parties in interest" (also within the meaning of Rule 2014(a)) in a way that the firm was at the time in a position to understand and appreciate. The firm's connections to them, through the Agreement, clearly came within the scope of Rule 2014(a) disclosure requirement.[17]

The Agreement also gave Latham & Watkins an interest that was adverse to that of the estate with respect to the matter as to which the firm was employed. It contractually bound the firm not to disclose materials of concern to the bankruptcy estates, to do its best to maintain their confidentiality, and to refrain from using them to pursue claims against Haney and others or even to put estate representatives on notice that such claims might ex-

---

**15.** There was considerable turnover in the management of MMT around the time of the bankruptcy filing, such that it is quite possible that those in charge during the bankruptcy case may not even have known of the Agreement.

**16.** I am not suggesting that a suitable arrangement might have been worked out in this case.

**17.** At the hearing on its Final Application, the firm (appearing through outside counsel) argued that it had thought the Agreement did not need to be disclosed because it was part of the firm's prepetition representation of the

Debtor, undertaken in furtherance of that representation. I reject this explanation. The Agreement was a connection with significant parties in interest. It is no less important a connection because it was entered into in furtherance of the firm's prepetition service to MMT. Moreover, postpetition representation of a debtor in possession differs from prepetition representation of the same debtor. The debtor in possession, as a fiduciary of the estate, is in important respects a new entity from the prepetition debtor, now having fiduciary obligations to the estate as a whole. The application process is designed to determine counsel's fitness to serve *the estate*.

ist. The firm was bound to honor these contractual obligations, and it had a financial incentive (avoidance of litigation and damages) to avoid dishonoring them. These were interests adverse to the estate with respect to the subject matter of the investigations.

To what extent has the estate been hurt by failure of the firm to timely disclose information that, but for the Agreement, the firm could and should have disclosed? On the record before me, I cannot determine with any precision the extent of harm that has actually resulted from the conflict and its nondisclosure. Even on a comprehensive record, the exercise might be largely speculative.[18] But if the firm honored its obligations under the Agreement, as I must assume it did, then the firm cannot have provided to the estate what the estate had reason to expect from the firm: zealous representation, unfettered by conflicting obligations under the Agreement. Moreover, in the debacle that this case has been,[19] it is far from clear that the harm has not been significant, even cata-strophic: according to allegations articulated by the Trustee, timely disclosure of some matters known to Haney and others might conceivably have averted $20 million in postpetition losses and enabled the Trustee to compete more successfully in a race for a limited pool of officers' and directors' liability insurance coverage. The connections represented by the Agreement situated the firm directly atop a major fault line in this bankruptcy.

In the circumstances of this case, where (a) multiple authorities were investigating serious allegations of malfeasance and criminal conduct by Haney and other parties to the Agreement, (b) the subject matter of these investigations was known to the firm and few others, and (c) because the Agreement was not disclosed, no mechanism was put in place to compensate for the handicap imposed by the Agreement, the firm's adverse interest was certainly disqualifying.[20] The importance of the Agreement and its nondisclosure require denial of all fees, including disgorgement of all fees paid to date.[21]

---

18. [W]here court-appointed counsel has served under an undisclosed disqualifying conflict of interest, the bankruptcy court cannot always assess with precision the effect the conflict may have had either on the results achieved or the results that might have been achieved by following "the road not taken." See *Woods*, 312 U.S. at 269, 61 S.Ct. at 497 ("[T]he incidence of a particular conflict of interest can seldom be measured with any degree of certainty [and][t]he bankruptcy court need not speculate as to [ ] the result of the conflict. . . ."). *Rome v. Braunstein*, 19 F.3d at 62–63.

19. Now over five years into the case, with all but the first nine months devoted to liquidation and litigation, the postpetition lender will likely not recover the full amount owing on its $20 million loan; administrative creditors (other than professionals) will realize only a small percentage on their claims; and unsecured creditors will likely get nothing.

20. I need not determine whether joint defense agreements are *always* disqualifying, though in many cases they will prove formidable obstacles. But agreements of this sort need at least to be disclosed in all relevant detail in the application to employ counsel and in the supporting verified statement. As in this case, their nondisclosure can only thicken the suspicion of conflict and betrayal of interest under which counsel will finally seek compensation.

21. The First Circuit Court of Appeals has stated:

"A fiduciary . . . may not perfect his claim to compensation by insisting that, although he had conflicting interests, he served his several masters equally well or that his primary loyalty was not weakened by the pull of his secondary one." *Woods v. City Nat'l Bank & Trust Co.*, 312 U.S. 262, 269, 61 S.Ct. 493, 497, 85 L.Ed. 820 (1941); *In re Roger J. Au*, 71 B.R. at 241. Especially where there has been a clear failure to make timely and spontaneous disclosure of all facts material to a disqualifying conflict

## 2. Other Objections

If the application were not entirely denied for the reasons addressed above, much of it would be denied on other grounds raised by the Chapter 11 Trustee and by the United States Trustee. Without attempting to be exhaustive, I note the following.

■ First, the firm seeks $5,268 in compensation and approximately $247 in reimbursement for services rendered and expenses incurred after the start of the case but before the Debtor had filed its application to employ the firm.[22] Under the local rule that was in effect when this case was commenced, the effective date of an order allowing an application to employ was, absent extraordinary circumstances, the date on which the application was filed. MLBR 2014–1(d) (effective August 1, 1997).[23] The Debtor's application for authority to employ the firm did not ask for retroactivity; the order granting authority to employ contained no provision for retroactivity;

of interest, counsel appointed pursuant to section 327(a) can lay no claim of right to a lesser sanction than the bankruptcy court is authorized to impose pursuant to section 328(c).

*Rome v. Braunstein*, 19 F.3d at 62. The same rule would apply to counsel appointed pursuant to § 327(e).

22. Where an attorney billed at two different rates over the period of the application but *the application does not specify which rate applied on a given date, the Court will assume the higher rate applied.* Expenses are listed by month, so expenses for January 1998, the month in which the application was filed and authorization to be employed became effective, have been prorated.

23. The local rule that was in effect when this case was commenced stated:

Absent extraordinary circumstances, post facto applications for appointment of professionals shall not be approved. An application shall not be considered timely if it is filed within fourteen days of the date of the case commencement or the date the professional commenced rendering services,

and the firm's applications for compensation do not expressly request retroactivity or mention extraordinary circumstances that might justify an effective date earlier than the date on which the application was filed. Therefore compensation for services and expenditures that predate the application to employ must be denied.

■ Second, the Final Application seeks compensation for services that were rendered, and reimbursement for expenses incurred, entirely after the Debtors in possession had been displaced as estate fiduciaries by the appointment of a Chapter 11 Trustee. The firm's service to the Debtors after that displacement was no longer in employment by the "trustee" within the meaning of § 327(e) and § 1107(a) and therefore is not compensable under § 330(a). All the compensation ($13,739.00) and reimbursement ($821.86) sought in the Final Application must be denied on this basis.[24]

whichever occurs later. If the application is approved, approval shall be deemed to have been granted as of the date of the filing of the application.

MLBR 2014–1(d) (effective August 1, 1997). The application to employ Latham & Watkins was not filed within fourteen days of the commencement of these cases (December 3, 1997) or of the date on which the firm began rendering postpetition services to the debtor. The firm's First Application for Interim Compensation, Exhibit F, indicates that services were rendered as early as December 5, 1997.

24. Most of the fees and expenses in this application would also be subject to denial on the basis that the tasks undertaken by the firm in this period were outside the scope of the firm's employment: producing documents to the Chapter 11 Trustee (and *withholding* documents from the Trustee on the basis of the Confidentiality and Joint Defense Agreement) and preparing the firm's own prepetition proof of claim. Moreover, some of the services were expressly rendered in opposition to the interests of the estate. Notably, the "Narrative of Services" portion of the Final Appli-

■ Third, the $3,946.00 in compensation that the firm seeks (through its Second Application for Interim Compensation) for preparing its First Application for Interim Compensation is excessive. The Final Application seeks further compensation for preparation of fee applications. Moreover, the firm filed a total of three applications for compensation, despite the fact that it performed services (other than preparation of fee applications) for which compensation can be allowed only in the period of the First Application. The Court would reduce the amount fought for preparation of the applications by half, approximately $2,000.

For these reasons, if the Applications were not denied in their entirety, the Court would disallow at least $21,000 of the compensation and $1,100 of the reimbursement sought for the reasons just enumerated. I need not address further objections going to the manner in which the firm has accounted for its expenditure of time.

### Conclusion

For the reasons set forth above, a separate final order will enter denying the First Interim, Second Interim, and Final Applications of Latham & Watkins in their entirety and requiring disgorgement of the compensation and reimbursement that was paid the firm on an interim basis.

cation states that the Firm's responsibilities in responding to subpoenas from the Trustee included "protecting the privileges and interests of the Debtors *and the Joint Defense Group.*" Final Application, Exhibit E, at p. 2 (emphasis added).